**No. 06-466C**
**(Judge Merow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

---

DISTRIBUTED SOLUTIONS, INC.,

and

STR, L.L.C.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS

---

Thomas A. Coulter
LeCLAIR RYAN, a Professional Corporation
951 East Byrd Street
Richmond, Virginia 23219
Mail: P.O. Box 2499
Richmond, Virginia 23218
Telephone: (804) 916-7103
Facsimile: (804) 916-7203
Email: thomas.coulter@leclairryan.com

November 13, 2006

Attorney for Plaintiffs

# TABLE OF CONTENTS


**INTRODUCTION** .......... **1**

**QUESTIONS PRESENTED** .......... **2**

**STATEMENT OF THE CASE** .......... **2**

**FACTS** .......... **6**

I. SUMMARY OF RELEVANT FACTS .......... 7

II. THE GOVERNMENT'S MISSTATEMENT OF "FACTS" .......... 8

**STANDARD OF REVIEW** .......... **10**

**ARGUMENT** .......... **10**

I. THE CONTRACTORS HAVE STATED COGNIZABLE CLAIMS IN CONNECTION WITH A PROPOSED PROCUREMENT .......... 10

A. The "In Connection With" Language of the Tucker Act Provides This Court With Jurisdiction .......... 13

B. The Government's Cited Authority Does Not Support Dismissal .......... 17

C. The Court's Exercise Of Jurisdiction Is Important To Stem The Improper Use Of Large, FSS Contractors To Limit Competitive Procurements .......... 22

II. THE CONTRACTORS ARE INTERESTED PARTIES PREJUDICED BY THE GOVERNMENT'S VIOLATIONS OF PROCUREMENT LAWS AND, THEREFORE, HAVE STANDING TO PURSUE THEIR CLAIMS IN CONNECTION WITH THE PROPOSED PROCUREMENT OF THE SOFTWARE PACKAGES .......... 24

A. The Contractors Are "Interested Parties" Challenging The Government's Decision To Use SRA For Non-Competitive Procurements Of The Software Packages .......... 24

B. The Contractors Were Prejudiced By The Government's Failure to Compete the Software Packages, Because They Had A Substantial Chance Of Receiving A Competitive Award To Provide Those Software Packages .......... 26

C. Potential Subcontractors Have Qualified As "Interested Parties" Under Similar Circumstances .......... 28

1. Phoenix Air Group Provides The Proper "Interested Party" Analysis .......... 28

2. The Government's "Interested Party" Authorities Are Inapposite .......... 30

III. THE GOVERNMENT'S MOTION TO DISMISS ADDRESSES ONLY THE CONTRACTORS' ALTERNATIVE GROUND FOR ESTABLISHING JURISDICTION – AS NOMINAL SUBCONTRACTORS CHALLENGING THE GOVERNMENT'S ROLE IN THE "SRA PROCUREMENT" ..... 31

A. Even If The Court Were To View This Protest As One Challenging SRA's Conduct In Connection With The Second RFI, The Contractors Still Can Establish Jurisdiction And Standing To Pursue Their Protest ..... 32

B. The GAO's Analysis Of Procurements "By" Or "For" The Government Supplies This Court With Jurisdiction ..... 33

C. The Government's Motion To Dismiss Focuses Primarily On An Inapposite Theory Of Jurisdiction Under the Johnson Controls Test ..... 35

D. Even Under Johnson Controls, The Contractors Can Establish Jurisdiction Because of SRA's Role As Purchasing Agent For the Government ..... 37

E. The Contractors Are "Otherwise In Privity" With The Government ..... 38

IV. THE CONTRACTORS HAVE STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED ..... 40

**CONCLUSION ..... 40**

## TABLE OF AUTHORITIES

**Cases** **Pages**

A&D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126 (2006) .............................17, 18, 19

Addison Constr., Inc., B-293805, April 20, 2004, 2004 CPD ¶ 105......................................... 33

Alfa Laval Separation, Inc. v. United States, 175 F.2d 1365 (Fed. Cir. 1999).......................... 27

American Management Systems, Inc., B-285645,
September 8, 2000, 2000 U.S. Comp. Gen. LEXIS 151, ¶ 163 ...............................17, 19

Anteon Corp., 2004 U.S. Comp. Gen. LEXIS 68, B-293523, B-293523.2,
March 29, 2004, CPD ¶ 51........................................................................................... 19

Aviation Data Serv., Inc., Recon., B-238057.2, Apr. 11, 1990, 90-1 CPD ¶ 383 ...................... 34

Banknote Corp. of America v. United States, 365 F.3d 1345 (Fed. Cir. 2004)......................11, 25

Bannum, Inc. v. United States, 404 F.3d 1346 (Fed. Cir. 2005)..........................................26, 27

Blue Dot Energy Co. v. United States, 2004 U.S. Claims LEXIS 330
(December 13, 2004), rev'd on other grounds, 179 Fed. Appx. 40,
2006 U.S. App. LEXIS 11018 (Fed. Cir. 2006).....................................................passim

Bluewater Environmental, Inc. v. United States, 60 Fed. Cl, 48 (2004)................................... 36

C C Distributors, Inc. v. United States, 38 Fed. Cl. 771 (1997) ............................................... 10

CACI, Inc.-Fed. v. United States, 719 F.2d 1567 (Fed. Cir. 1983) .......................................... 27

CCL, Inc. v. United States, 39 Fed. Cl. 780 (1997) ...........................................................passim

Conley v. Gibson, 355 U.S. 41 (1957) ..................................................................................... 10

CSE Constr. Co. v. United States, 58 Fed Cl. 230 (2003)........................................................ 33

CW Government Travel, Inc. v. United States, 61 Fed. Cl. 559 (2004) .................................. 10

Cybertech Group, Inc. v. United States, 48 Fed. Cl. 638 (2001).............................................. 26

Data Gen. Corp. v. Johnson, 78 F.3d 1556 (Fed. Cir. 1996) ................................................... 26

Eagle Design & Management, Inc. v. United States, 62 Fed. Cl. 106 (2004)............................ 30

Electro-Voice, Inc., B-278319, B-278319.2,
January 15, 1998, 1998 U.S. Comp. Gen. LEXIS 12................................................... 13

Galen Med. Assocs. v. United States, 369 F.3d 1324 (Fed. Cir. 2004) .................................... 26

Hamlet v. United States, 873 F.2d 1414 (Fed. Cir. 1989) ........................................................ 10

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324
(Fed. Cir. 2001)............................................................................................................. 27

Info. Sciences Corp. v. United States, 2006 U.S. Claims LEXIS 274
(September 19, 2006)...............................................................................................26, 27

Labat-Anderson, Inc. v. United States, 346 F. Supp. 2d 145 (D.D.C. 2004) ............................ 13

Lockheed Martin Corporation v. United States, 48 Fed. Appx. 752 (September 30, 2002) .......... 38

McNutt v. General Motors Acceptance Corp., 298 U.S. 178 (1936) .......... 10

Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366 (Fed. Cir. 2002) .......... 26, 27

Ocean Enterprises, Ltd., 65 Comp. Gen. 585 (1986) .......... 32

Optimum Systems, Inc., 54 Comp. Gen. 767 (1975) .......... 32

OTI America, Inc. v. United States, 68 Fed. Cl. 108 (2005) .......... passim

PGBA, LLC v. United States, 60 Fed. Cl. 196 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004) .......... 8, 10, 11

Perez v. United States, 156 F.3d 1366 (Fed. Cir. 1998) .......... 10

Perkin-Elmer Corp., Metco Div., B-237076, Dec. 28, 1989, 89-2 CPD ¶ 604 .......... 34

Phoenix Air Group v. United States, 46 Fed. Cl. 90 (2000), dismissed, 243 F.3d 555 (Fed. Cir. 2000) .......... 13, 28, 29, 30

RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286 (Fed. Cir. 1999) .......... 11, 12, 16

Rex Serv. Corp. v. United States, 448 F.3d 1305 (Fed. Cir. 2006) .......... 25

RGB Display Corp., B-284699, May 17, 2000, 2000 CPD ¶ 80) .......... 33

RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125 (6th Cir. 1996) .......... 38

St. Mary's Hosp. and Med. Ctr. of San Francisco, Calif., B-243061, June 24, 1991, 1991 CPD ¶ 597) .......... 33, 35

Statistica, Inc. v. Christopher, 102 F.3d 1577 (Fed. Cir. 1996) .......... 27

Tel-Instrument Elecs. Corp. v. United States, 56 Fed. Cl. 174 (2003) .......... 33

ToxCo, Inc., 68 Comp. Gen. Dec. B-235562, August 23, 1989, 89-2 CPD ¶ 170 .......... 32, 34

U.S. West Communication Services, Inc. v. United States, 940 F.2d 622 (Fed. Cir. 1991) .......... 36

United States v. Johnson Controls, Inc., 713 F.2d 1541 (Fed. Cir. 1983) .......... passim

Univ. of Mich.; Indus. Training Sys. Corp., 66 Comp. Gen. 538, June 30, 1987, 87-1 CPD ¶ 643) .......... 34, 35

Waste Management of North America, Inc. v. Weinberger, 862 F.2d 1393 (9th Cir. 1988) .......... 31

**Statutes**

10 U.S.C. § 2302, et seq. (Competition in Contracting Act—"CICA") .......... 1

10 U.S.C. § 2304(a)(1)(A) .......... 1

28 U.S.C. § 1491 (b)(1) (Tucker Act) .......... passim

31 U.S.C. § 3551(2)(A) .......... 25

31 U.S.C. § 3551, et seq. (Competition in Contracting Act—"CICA") .......... passim

41 U.S.C. § 152 (Armed Services Procurement Act) .......... 29

41 U.S.C. § 253j (Federal Acquisition Streamlining Act--"FASA") .......... 18

41 U.S.C. § 403 .......... 12

Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996) (Administrative Dispute Resolution Act--"ADRA") .......... 10, 12

Services Acquisition Reform Act of 2003, Section 1423 .......... 22, 23

4 C.F.R. § 21.3(m)(10) .......... 34

RCFC 12(b)(6) .......... 3, 40

RCFC 52.1 .......... 6

**Miscellaneous**

GAO High Risk Update (GAO-05-207) (January 2005) .......... 22, 23

Gordon, Dan I., Organizational Conflicts of Interest: A Growing Integrity Challenge, 35 Pub. Cont. L.J. 25 (2005) .......... 23

Dollars, Not Sense: Government Contracting Under the Bush Administration, Prepared for Rep. Henry A. Waxman by the United States House of Representatives Committee on Government Reform – Minority Staff, Special Investigations Division (June 2006) .......... 23

House Conference Report, No. 104-841, 104th Cong., 2d. Sess. (1996) .......... 12

Senate Armed Services Committee Report, No. 109-254, 109th Cong., 2d. Sess. (2006) .......... 23, 24

Schooner, Steven L. & Christopher R. Yukins, Emerging Policy and Practice Issues, The George Washington University Law School Public Law and Legal Theory Working Paper No. 193, West Government Contracts Year in Review Conference (2005) .......... 23

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| DISTRIBUTED SOLUTIONS, INC., | ) | |
| and | ) | |
| STR, L.L.C., | ) | |
| Plaintiffs, | ) | No. 06-466 C |
| v. | ) | (Judge Merow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS

Plaintiffs, Distributed Solutions, Inc. ("DSI"), and STR, L.L.C. ("STR") (collectively the "Contractors"), file this Opposition to the Government's Motion to Dismiss ("Opposition").

## INTRODUCTION

> *This post-award bid protest tests the vitality of the Competition in Contracting Act, 10 U.S.C. § 2302, et seq. ("CICA"), that requires executive federal agencies procure property or services to "obtain full and open competition through the use of competitive procedures[.]" 10 U.S.C. § 2304(a)(1)(A). Although, the underlying dispute pits two business rivals against the other akin to David and Goliath, the import of the case concerns the jurisdiction of the United States Court of Federal Claims and exercise thereof to ensure that competition is not relegated to a mere platitude or simply a "goal" in government contracting, but rather is the governing principle that Congress intended when the CICA was enacted.*

Blue Dot Energy Co. v. United States, 2004 U.S. Claims LEXIS 330 (December 13, 2004), rev'd on other grounds, 179 Fed. Appx. 40, 2006 U.S. App. LEXIS 11018 (Fed. Cir. 2006). This bid protest presents the same fundamental concerns regarding the preservation of competition in government contracting. This lawsuit challenges the Government's decision to use a lead systems integrator, instead of two qualified small businesses, in connection with a proposed procurement and eventual procurement of software. By deciding to use a lead systems integrator

to privatize the procurement, instead of directly procuring its software, the Government has failed to comply with numerous procurement laws and regulations designed to ensure fair and open competition. Undaunted, the Government has claimed that, by inserting the lead systems integrator into the procurement process and having that integrator actually procure the software for the Government, rather than the Government doing so directly, the Government's conduct during the entire procurement process is not subject to scrutiny. Fortunately, the clear language of the Tucker Act gives the Court jurisdiction and gives the Contractors standing to challenge the Government's efforts to avoid the procurement process.

## QUESTIONS PRESENTED

1. Whether the Court has jurisdiction to entertain the Contractors' protest of the Government's failures to abide by competitive procurement requirements and, instead, to use a lead systems integrator in connection with its proposed procurement and eventual non-competitive procurement of that software?
2. Whether the Contractors have standing as interested parties entitled to pursue their protest?
3. Whether the Contractors can establish alternative grounds for jurisdiction and standing in connection with the "SRA procurement," because of SRA's role as an agent for the Government?

## STATEMENT OF THE CASE

The Government's Motion to Dismiss misstates the Contractors' bases for jurisdiction and mischaracterizes the Contractors' claims by asserting that they are simply subcontractors challenging a private procurement or are challenging the issuance of a task order, both of which

are allegedly beyond this Court's bid protest jurisdiction.[1] However, under the clear language of the Tucker Act, 28 U.S.C. § 1491 (b) (1), this Court has jurisdiction over any protest "in connection with a procurement or a proposed procurement." The Government's Motion to Dismiss fails to address this language and, therefore, its Motion is of little consequence in assessing the Court's jurisdiction to entertain this protest.

Here, the Contractors are challenging the Government's decision to use a lead systems integrator, SRA International, Inc. ("SRA"), to procure two separate software packages, instead of competitively procuring them directly. Once the Government initiated the procurement process and decided to procure new software, it had the option of doing so through the typical route of issuing requests for quotations ("RFQ") or requests for proposals ("RFP"); instead, the Government chose to use a lead systems integrator to accomplish its procurement needs without conducting a competitive procurement. The Government's choice was obviously "in connection with a proposed procurement," since there is no dispute that the Government had decided to procure the new software packages, as a result of their own Request for Information, and was simply deciding the method by which it would do so. During its decision-making process, the Government failed to conduct the required analyses to check for any organizational conflicts of interest ("OCI") that might be implicated by using SRA and to justify its decision to bundle the procurements of the separate software packages. Had it done so, those analyses would have indicated that the Government should have chosen a different procurement strategy – one that offered the procurements directly to the Contractors. Instead, by improperly utilizing SRA to accomplish its procurement needs, the Government deprived the Contractors, two qualified,

---

[1] The Government also seeks dismissal pursuant to RCFC 12(b)(6) for failure to state a claim, but does not assert any legal deformity regarding any of the Contractors' six claims other than the alleged lack of jurisdiction and standing to pursue those claims. Therefore, the Government's Motion to Dismiss for failure to state a claim should be denied.

small businesses, of the opportunity to compete for the award of multi-million dollar contracts and allowed SRA to modify the procurement parameters and "recommend" subcontractors, both of which favor SRA's own interests over those of the Government. Thus, the Contractors are challenging the Government's failure to compete the software procurements at issue and its handling of the entire procurement process.

The Government mischaracterizes the Contractors' bid protest as one challenging the Government's decision to issue a task order to an IDIQ contractor, which is allegedly not subject to challenge in this Court. To the contrary, the crux of this protest is not the choice of issuing a task order to SRA, as opposed to a competing IDIQ contractor for those same integration services; it is the Government's decision, without conducting the required analyses, to utilize that task order in the first place to allow the IDIQ contractor to procure software for the Government, instead of procuring the software directly through competitive means. Thus, the analysis supplied by the Government is simply inapplicable.

The Government's decision reflects a federal contracting trend toward utilizing larger contractors for procurement of goods and services for the Government, thereby, privatizing the procurement process. Fortunately, the broad language of the Tucker Act (allowing jurisdiction to hear bid protests "in connection with a procurement or a proposed procurement") allows this Court to review such Government decisions to prevent unchecked violations of federal procurement laws and regulations.

In addition to establishing jurisdiction under the Tucker Act, the Contractors have standing as "interested parties" to pursue their claims before this Court. Both Contractors submitted qualifying proposals in response to the Government's Request for Information that rendered them eligible for award of the contracts at issue. DSI is the incumbent provider of acquisition assistance software at USAID; STR was the only offeror who met the criterion of

offering a successfully deployed grants management system and has provided similar software to another federal agency. Both were clearly prejudiced when deprived of the opportunity to compete for multi-million dollar contracts, which they had a "substantial chance" of receiving.

Because it mischaracterizes the Contractors' claims, the Government's Motion to Dismiss focuses almost exclusively on one of the Contractors' alternative grounds for jurisdiction – a challenge to the "SRA procurement" pursuant to the Second RFI, because, even though SRA is nominally the prime contractor, the Government controlled the procurement to a degree that renders SRA a mere pass-through agent and allows the Contractors to challenge what are essentially the Government's procurement decisions.

The Government's Motion to Dismiss fails to address the primary argument presented during the GAO proceeding – that the procurement was "by" the Government, which provides an additional ground for establishing jurisdiction. Instead, the Government focuses on an alternative argument – the Government as purchasing agent pursuant to the Johnson Controls test. The Government's formulaic analysis relies primarily on the fact that SRA, not the Government, signed a contract with the current software providers, and, therefore, any protest by other potential software providers is by that of a "subcontractor," which cannot challenge Government procurement decisions due to a lack of privity. However, the facts in the current, incomplete administrative record already show that SRA was acting as the procurement agent for the Government, which is a sufficient, additional ground for establishing jurisdiction. Furthermore, even under Johnson Controls, the Contractors can demonstrate the necessary requirements for jurisdiction, including the admission in the subcontracts that SRA is acting as an agent for the Government and that the Government controls payment to the subcontractors.

As a policy matter, the procurement laws and regulations and this Court's jurisdiction should not be so easily circumvented by simply inserting a prime contractor to procure the same

goods the Government had already decided to procure, thereby, shielding the Government's decision from review. If allowed, the alarming trend toward the use of large supply schedule providers to, in effect, privatize procurements will continue to limit the number of competitive contract awards. The inevitable effect will be to hurt small businesses by limiting available contracts for bid, contrary to the goal of full and open competition pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551, et seq., and by limiting this Court's bid protest review of those non-competitive procurements. Congress foresaw this trend and has provided this Court with a sufficient jurisdictional grant to address it.

## FACTS

For purposes of this Opposition, the facts are set forth in the Complaint, paragraphs 5-26, which facts are incorporated by reference herein.

In its Motion to Dismiss, the Government frequently cites to the Administrative Record, as currently constituted. The Contractors object to the Court's consideration of any facts referenced by the Government in its Motion to Dismiss that go beyond the Complaint. Such consideration would convert this Motion to Dismiss into a premature Motion for Judgment on the Administrative Record per RCFC 52.1.[2] By moving to dismiss and relying upon evidence in the administrative record, the Government is attempting to obtain a premature ruling from the Court based upon an incomplete record. The Contractors have already filed a comprehensive Motion to Supplement the Administrative Record, which is still pending. The Government should not be permitted to proceed with a request for a ruling that relies on the current state of the administrative record until the Court determines whether the record is sufficient to enable it to conduct a meaningful review of the Contractors' claims.

---

[2] Even if the Government's Motion to Dismiss is appropriate for consideration under Rule 52.1, it has failed to comply with that rule by, among other things, filing a Statement of Facts. RCFC 52.1.

## I. **Summary of Relevant Facts**

Should the Court consider the additional facts cited by the Government, then the Contractors incorporate by reference the facts set forth in their Complaint and in the Contractors' Motion to Supplement the Record and their Reply to the Government's Response to their Motion to Supplement the Administrative Record. The following is a summary of those facts:

STR is a small business software provider of, among other things, grants management software. On June 27, 2005, when the Government issued Request for Information (the "First RFI"), STR's software, as opposed to all other offerors, was already in production at the federal level – a key criterion of the RFI's at issue. DSI is a small business software provider of, among other things, acquisition assistance software. DSI was the incumbent software provider for USAID's current acquisition assistance software. Complaint, ¶¶ 9-11.

After each Contractor had responded to the First RFI, on August 12, 2005, the Government announced unexpectedly that they had "decided to pursue alternative courses of action," in selecting the software packages described in the First RFI. On that same day, SRA issued an ostensibly "commercial" RFI (the "Second RFI"), which was remarkably similar to the First RFI. Both DSI and STR responded to the Second RFI and provided demonstrations of their respective software products. Complaint, ¶¶ 11-20.

In the Fall of 2005, DSI and STR were each notified that their respective software packages had not been selected for procurement. Instead of STR's grants management software, SRA had apparently "recommended" that the Government purchase the software product offered by Infoterra, a Canadian company unlicensed to do business in the United States and with no product currently installed in a production environment. Similarly, instead of selecting the acquisition assistance software offered by DSI, SRA "recommended" CompuSearch, on whose Board of Directors sits a former high-ranking SRA official. Those "recommendations" resulted

in contracts for Infoterra and CompuSearch without the use of any competitive measures to award those contracts. Complaint, ¶¶ 18, 22, 23, 46-48. The Government has never explained why it varied from its standard practice by having SRA actually procure the software at issue, rather than doing so directly and has never explained why it chose to purchase the "recommended" software without a full and open competition, including pricing, to ensure the Government received the "best value."

## II. The Government's Misstatement of "Facts"

Without addressing each misstatement of fact in the Motion to Dismiss, the primary flaw in the Government's recitation of facts is that it relies, almost exclusively, on statements in several declarations supplied by various USAID and SRA representatives. See Motion to Dismiss at 6-7. These post-hoc rationalizations are of questionable value, particularly for a Motion to Dismiss. See PGBA, LLC v. United States, 60 Fed. Cl. 196, 204 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004) ("in examining [an expanded administrative] record, this court is mindful that it must critically examine any post hoc rationalization"). Furthermore, the Government declarations do not explain the procurement process in which the Government engaged, including why the Government changed course from procuring the software packages directly, to a process that involved SRA, and they do not explain whether the Government engaged in the proper OCI and bundling analyses before deciding to do so.

Finally, those Government declarations are insufficient to overcome the current record evidence indicating extensive Government involvement in the entire procurement process. Although, in the GAO protests, USAID asserted that it had a limited role in the procurement process, the few documents included in the administrative record seem to suggest otherwise. For example, the Source Selection Evaluation Team ("SSET") was comprised entirely of Government personnel; SRA provided only technical assistance. AR 198-202. In fact, the

Source Selection Authority ("SSA") with final authority was a Government representative. AR 736, 749. Yet, USAID submitted declarations containing the unsupported assertion that SRA handled the bulk of the procurement process. AR 167-176. Of course, the Plaintiffs submitted counter-declarations indicating that the Government had a much broader role in the procurements at issue. AR 149-156. Under these circumstances, a blanket statement in a declaration submitted by the Government should not suffice to establish SRA's role and does not provide sufficient detail regarding that role.

As set forth in detail in the Contractors' Motion to Supplement the Administrative Record, there are no documents in the current administrative record relating to the Agencies' decision to discard the RFI process in favor of allowing SRA to carry the process forward, no documents reflecting SRA's role or responsibilities in the RFI process, no documents relating to any OCI analysis, or any bundling analysis regarding the decision to procure the two separate software packages as part of one process, no documents to explain the relative ranking/scoring decisions of the offerors that lead to the "recommendations" at issue, and no documents in between the "recommendations" and the final contracts with Infoterra and CompuSearch. Documents in all of these categories are important to determine why the Government failed to performed the requisite analyses of OCI and bundling, and will inform the Court as to the effects of the Government's failure to do so, namely that SRA "recommended" software that best served SRA's own interests.

Furthermore, the Government relies heavily on the fact that SRA, not the Government, entered into the "subcontracts" for the software packages at issue and that "SRA alone is able to direct the subcontractors' activities and manage their work." Motion to Dismiss at 7. However, the subcontracts reveal that SRA acknowledges its role as a mere agent for the Government and that the Government controls payment to the subcontractors. Specifically, the subcontract states:

**"[a]s SRA acts as agent for USAID on this subcontract**, acceptance and approval from USAID must be obtained by SRA in order to dispense payments. . . ." AR 659.

## STANDARD OF REVIEW

"In passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, unchallenged allegations of the complaint should be construed favorably to the pleader." CW Government Travel, Inc. v. United States, 61 Fed. Cl. 559, 567-68 (2004) (citing Hamlet v. United States, 873 F.2d 1414, 1416 (Fed. Cir. 1989)). The court is also to draw all reasonable inferences in favor of the plaintiff. Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998).

The burden of establishing jurisdiction is on the plaintiff. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936); C C Distributors, Inc. v. United States, 38 Fed. Cl. 771. 774 (1997). However, the court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that will entitle it to relief. C C Distrib., 38 Fed. Cl. at 774 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

## ARGUMENT

### I. The Contractors Have Stated Cognizable Claims In Connection With A Proposed Procurement

In its Motion to Dismiss, the Government fails to discuss the very language in the Tucker Act upon which the Contractors rely to establish jurisdiction in this Court, as set forth in their Complaint – "in connection with a procurement or a proposed procurement." Since January 1, 2001, this court has had exclusive jurisdiction over bid protests under Subsection (b) of the Tucker Act, 28 U.S.C. § 1491(b), added by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996) ("ADRA"). See PGBA, LLC v. United

States, 389 F.3d 1219, 1224 (Fed. Cir. 2004); Banknote Corp. of America v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). In relevant part, Paragraph (1) of Subsection (b) provides:

> (1) *the United States Court of Federal Claims . . . shall have jurisdiction* to render judgment *on an action* by an interested party *objecting to* a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement*.

28 U.S.C. § 1491 (b)(1) (emphasis added).

As explained in OTI America, Inc. v. United States, 68 Fed. Cl. 108 (2005), Subsection (b) of the Tucker Act sets forth three separate grounds for establishing jurisdiction for bid protests:

1. "an action . . . objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award . . . of a contract," *i.e.*, a pre-award protest.

2. "an action . . . objecting . . . to . . . the award of a contract," *id*., *i.e.*, a post-award protest.

3. "an action . . . objecting . . . to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

Id. at 113 (citing 28 U.S.C. § 1491 (b) (1)). The first two categories of this court's bid protest jurisdiction, a pre-award protest or a post-award protest, are well recognized and relatively standard proceedings. The third category of this court's bid protest jurisdiction is less well-defined. It has been invoked to provide this Court with jurisdiction regarding overrides of the automatic stay of the subject procurement. Id. at 113 (citing RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1288-89 (Fed. Cir. 1999)). As noted in OTI, in addition to override cases, the third prong of Paragraph (1) of Subsection 1491(b) has provided this Court with jurisdiction when an agency endeavored to expand the scope of a contract to conduct a new procurement without competitive bidding. See CCL, Inc. v. United States, 39 Fed. Cl. 780, 788-

89 (1997), discussed, infra. The CCL decision was cited approvingly by the Federal Circuit in RAMCOR. See 185 F.3d at 1289.

The question presented in OTI was whether the third, concluding prong of Paragraph (1) of Subsection 1491(b) embraced yet a further situation where the agency entered into identical multi-award contracts that essentially involved a competition in stages to develop a new product, and ultimately to procure that product, and the protest concerned objections to the agency's actions in eliminating one of the competitors at an early stage. Specifically, in OTI, the Court found that it had jurisdiction, based upon the "in connection with" language of the Tucker Act, to review the Government's decision during an early stage of a procurement process regarding electronic passport covers, which resulted in the elimination of an offeror from consideration for future orders. 68 Fed. Cl. at 112.

In making its decision, the Court noted that the third prong of Paragraph (1) has been given a broad interpretation. Id. at 113 (citing RAMCOR, 185 F.3d at 1289 ("The operative phrase 'in connection with' [a procurement or a proposed procurement] is very sweeping in scope."). The OTI Court explained:

> As the Court of Appeals for the Federal Circuit stated in RAMCOR, **"[a]s long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."** 185 Fed. Cir. at 1289. Moreover, Congress has defined the term "procurement" to include "all stages of the process of acquiring property or services, **beginning with the process for determining a need for property or services** and ending with contract completion and closeout." 41 U.S.C. § 403. Furthermore, when Congress enacted the ADRA in 1996, adding subsection (b) to the Tucker Act, its goal was to grant this court jurisdiction "over the full range of procurement protest cases." H.R. CONF. REP. 104-841, at 10 (1996).

Id. at 114 [Emphasis added]. As a result, the Court found that OTI had easily established jurisdiction "in light of the broad language of Subsection 1491(b) and Congress's expressed intent that the Subsection encompass the entire procurement process. . . ." Id. at 117. The Court recognized that OTI was essentially a disqualified bidder, and, even though it was eliminated

from the procurement process early on, that early elimination did not affect the Court's jurisdiction.

A. The "In Connection With" Language of the Tucker Act Provides This Court With Jurisdiction

In addition to OTI, other cases have similarly confirmed the breadth of this Court's jurisdiction "in connection with a procurement or a proposed procurement." In fact, courts have consistently read the ADRA to encompass cases like this protest where the Government never undertook a public competition for the contract - and thus there was no federal procurement process to protest - but the challenged conduct was otherwise "in connection with a procurement or proposed procurement." See, e.g., Labat-Anderson, Inc. v. United States, 346 F. Supp. 2d 145, 154 (D.D.C. 2004) (finding jurisdiction over the Government's decision to have distribution services work performed in-house, instead of engaging in a competitive procurement for that work); Phoenix Air Group v. United States, 46 Fed. Cl. 90 (2000), dismissed, 243 F.3d 555 (Fed. Cir. 2000) (holding that ADRA encompasses complaint by incumbent subcontractor alleging that the Government was violating the law "by its sole-source acquisition of training flight services . . . without any competition"); Electro-Voice, Inc., B-278319; B-278319.2, 1998 U.S. Comp. Gen. LEXIS 12 (January 15, 1998) (finding jurisdiction to hear protest of the Government's downselection decision for future task orders on an IDIQ contract).

Two additional cases demonstrate the Court's jurisdiction to review the Contractors' bid protest under the "in connection with" language of the Tucker Act under similar circumstances. In CCL, Inc. v. United States, 39 Fed. Cl. 780 (1997), the Government failed to renew the plaintiff's computer maintenance contract and, instead, gave that work to a competitor without conducting a competitive procurement by simply modifying the terms of the competitor's contract. This Court found that it had jurisdiction because the Tucker Act

> "permits both a suit challenging government action which is self-consciously a competitive procurement as well as what CCL is claiming here: that [the Government] is procuring goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is in violation of law."

Id. at 789.

Blue Dot Energy Co. v. United States, 2004 U.S. Claims LEXIS 330 (December 13, 2004), rev'd on other grounds, 179 Fed. Appx. 40, 2006 U.S. App. LEXIS 11018 (Fed. Cir. 2006) provides apt precedent with strikingly similar facts. In Blue Dot Energy, this Court found that it had jurisdiction to hear the protest of a small offeror challenging the sole-source award to a much larger offeror. Blue Dot Energy involved a tortured and complicated bidding and protest process. In essence, the protest involved a solicitation for waste management services which was to be a set-aside for historically underutilized business zones ("HUBzones"). The Air Force initially issued a HUBzone solicitation but, after a series of protests, decided that it would issue a sole-source contract to Waste Management, Inc. in order to avoid having to comply with the HUBzone restrictions. Id. at *21. Blue Dot protested and the Court found that it had jurisdiction to hear Blue Dot's challenge. The Court stated that because the procurement process included the Air Force's cancellation of the HUBzone solicitations, to which Blue Dot had submitted qualifying offers, and its pursuit, instead, of a sole source solicitation to procure the waste management services at issue, Blue Dot's protest was "in connection with" a procurement. Id.

In this case, there is ample authority, as noted above, to find that the Contractors' protest is in connection with a procurement. Here, the Government began the procurement process with a Request for Information (the "First RFI"), drafted with input from SRA, to determine whether it could use COTS products to meet the needs of its JAAMS project in upgrading the Government's information technology systems. After soliciting that information, the Government suddenly and inexplicably changed course. Rather than issue a request for

proposal/quotation, the Government issued an announcement (which appeared on the Federal Business Opportunities website) indicating, "…the Government has decided to pursue alternative courses of action." Complaint, ¶ 13. It eventually became clear that the only "alternative course of action" was to issue a nearly identical RFI through their agent, SRA. Complaint, ¶ 13. In fact, on the same day that the Government announced a decision "to pursue alternative courses of action," August 12, 2005, SRA (a competitor of STR's and of DSI's in the software integration and management arena) issued its substantially similar Second RFI. Complaint, ¶ 14. The similarity of the Second RFI to the First RFI was not surprising, since SRA apparently participated in the drafting of the First RFI. AR 15.

As a result of the entire RFI process, SRA "recommended" to the Government-dominated source selection authority, that it select two software packages, both of which require significant integration services, which inures to the direct benefit of SRA. Complaint, ¶¶ 18-20, 47-48. SRA then entered into contracts with the two selected software providers. Complaint, ¶ 24.

In this protest, the Contractors are challenging a decision made during the procurement process "in connection with" a proposed procurement, not just the ultimate procurement decision itself. The JAAMS program, which was the subject of the First RFI and was already underway before issuance of that RFI, was designed, in part, to upgrade software. AR 169-170. When issuing the First RFI, the Government was obviously in the process of gathering information for a proposed procurement of that software. The Government's own declarations acknowledge that the First RFI determined the parameters of the eventual procurement of the software at issue. AR 170. However, after issuing the First RFI, the Government obviously made a decision to cancel its anticipated direct, proposed procurement and, instead, use SRA to complete the procurement process, including actual procurement of the software packages that the Government eventually purchased through SRA. See AR 170. Before making that decision, the

Government failed to conduct the required OCI and bundling analyses, which would have indicated that the Government should not use SRA for the software procurements, because of SRA's conduct in selecting "subcontractors" that benefited its own interests, rather than those of the Government.

The fact that the Contractors responded with qualifying responses to the First RFI and that, because of the Government's improper use of SRA to ultimately handle the procurement, they were deprived of an opportunity to compete for the software packages clearly establishes that their protest is in connection with a proposed procurement, as well as in connection with the actual procurement of the software packages at issue. The fact that they were eliminated from the procurement process at an early stage, based on the Government's decision to use SRA to procure the software, rather than doing so directly, does not remove the Contractors' claims from this Court's jurisdictional reach. As the Court in OTI made clear, for purposes of this Court's bid protest jurisdiction, the procurement process begins with determining the need for goods and services, accomplished here through issuance of the First RFI, and the Court's jurisdictional grant is intended to encompass the full range of procurement protests. 68 Fed. Cl. at 114; see RAMCOR, 185 Fed. Cir. at 1289. Here, the process began through issuance of the First RFI, was continued, based on information from the First RFI, through the issuance of the Second RFI, and concluded with the procurement of the software packages, based on information obtained from the RFI process. Complaint ¶¶ 11-24. Thus, because the Contractors are challenging the Government's decision to "pursue an alternative course of action" by inserting SRA into the process, without the required OCI or bundling analyses, and culminating in non-competitive procurements of the software packages ostensibly conducted by SRA, the Contractors' claims are within the procurement process and, therefore, cognizable in this Court.

Just as in CCL and Blue Dot, the Government chose to ignore the option of full and open competition in favor of a more limited procurement method. In the past, even when using a lead systems integrator, the Government has typically followed an RFI with its own RFQ's or RFP's to procure directly, through competitive means, the goods or services identified through the RFI process. See, e.g., American Management Systems, Inc., B-285645, 2000 U.S. Comp. Gen. LEXIS 151, ¶ 163, at *3-*6 (September 8, 2000) (lead systems integrator assists Government in Government's direct procurement of software packages). There was no reason that the Government needed to vary from that course in this instance and, by doing so, it violated a host of federal procurement statutes and regulations. For purposes of establishing jurisdiction, the Contractors have clearly alleged violations of statutes that have a connection to a procurement proposal, namely the CICA, the Small Business Act, the Administrative Procedures Act, and federal regulations requiring OCI and bundling analyses, which, according to the Federal Circuit, "suffices to supply jurisdiction." 185 Fed. Cir. at 1289; see Complaint, ¶¶ 5, 8. As this Court noted in CCL, Inc. v. United States, 39 Fed. Cl. 780, 789 (1997), the Tucker Act provides for bid protest jurisdiction not only for challenges to competitive procurements, but also for instances when the Government "is procuring goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is in violation of law." That expanded jurisdictional reach captures precisely the Contractors' allegations in this case.[3] Accordingly, the Contractors have established jurisdiction in this Court.

B. The Government's Cited Authority Does Not Support Dismissal

The Government relies primarily on one case in support of its position that the Court lacks jurisdiction to hear this bid protest – A&D Fire Protection, Inc. v. United States, 72 Fed.

---

[3] In fact, CCL involved a modification to a contract beyond its initial scope, which is one of the claims asserted by the Contractors. Complaint, ¶¶ 55-58.

Cl. 126 (2006). See Motion to Dismiss at 21. That case is inapplicable and, thus, the Government has no authority to support its request for dismissal.

A&D Fire Protection concerns a protest by one IDIQ contract supplier regarding the award of a task order to another IDIQ contract supplier. The Court found that the relevant provisions of the Federal Acquisition Streamlining Act ("FASA"), 41 U.S.C. § 253j, were applicable and barred A&D's protest. As described by the Court, "when a procurement envisioned a multiple award IDIQ contract, creating, through competition, a pool of contractors for certain work projects, the issuance of individual task orders to these contractors would not be subject to protests." Id. at 12. The rationale for not allowing protests concerning the award of a task order to one IDIQ contractor versus another one is that each of those contractors have already been offered a competitive procurement – when obtaining their IDIQ contract award.

That is not the situation at issue here. This protest does not concern a Government decision to award a task order to one IDIQ contractor to directly procure goods and services and a subsequent challenge, by other IDIQ contractors regarding which one of them should have received the task order. To the contrary, the very heart of the problem in this case is that there has never been a competitive procurement involving SRA, DSI, STR and others for the supply of software and integration services to USAID, nor has there been any explanation for the failure to conduct a competitive procurement. See CCL, 39 Fed. Cl. at 791 ("[t]he heart of plaintiff's case is that the government violated CICA by procuring goods and services from [a contractor] without either the necessary competition or findings excusing competition"). As A&D Fire Protection recognized, this case is more like OTI, because it concerns a challenge to the elimination of competition at an early stage of a procurement process. See A&D Fire Protection, 72 Fed. Cl. at *26 n. 8. Similarly, this procurement involves the Government's decision to eliminate all offerors from a competitive procurement opportunity and, instead, to simply order

services from an IDIQ contractor, and assign it non-competitive procurement authority for separate software packages.[4]

The crux of this protest, therefore, is not the choice of issuing a task order to SRA, as opposed to a competing IDIQ contractor for those same integration services; it is the Government's decision to utilize a task order, beyond the limits of the associated statement of work and without exercising the regulatory safeguards provided by the OCI and bundling analyses, to allow SRA to procure software for the Government without competition, instead of procuring the software directly through competitive means. Under these circumstances, when the challenge involves the failure to compete the goods and services at issue, not just a protest over which IDIQ contractor should have received a task order, FASA and the analysis supplied by A&D Fire Protection are simply inapplicable.[5]

To rule otherwise would render the "in connection with" language superfluous. The first two grounds for bid protests set forth in the Tucker Act provide the Court with jurisdiction over

---

[4] A proper role for SRA, if any, would have been to advise the Government of its recommendation, having no economic interest in that recommendation. The Government could then rely on that recommendation and compete the software for price using their standard method, either an RFP or an RFQ. See American Management Systems, Inc., B-285645, 2000 U.S. Comp. Gen. LEXIS 151, ¶ 163 (September 8, 2000).

[5] Even if the Court finds that A&D Fire Protection and the FASA provision cited therein are relevant to this bid protest, the Contractors have still stated proper grounds to establish jurisdiction. A&D Fire Protection reaffirmed that, if there is a challenge to the scope of the task order award, the Court has jurisdiction to hear that challenge. See id. at *26. In Count 5 of their Complaint, the Contractors assert that the issuance of the task order to SRA was for work beyond its FSS contract and, thus, required competitive bidding. Complaint, ¶¶ 55-58. Therefore, the Contractors have satisfied the exception to FASA barring challenges to the issuance of task orders. See A&D Fire Protection, 72 Fed. Cl. at 134 n.8; Anteon Corp., 2004 U.S. Comp. Gen. LEXIS 68, B-293523, b-293523.2, CPD ¶ 51, at *2 (March 29, 2004); see also CCL, 39 Fed. Cl. at 791 (contractor has jurisdiction to challenge work awarded outside of an existing contract by modification of that contract). Moreover, A&D Fire Protection did not involve the Small Business Act, which does not provide exemptions from CICA, as FASA is alleged to provide. This is yet another reason that this Court has jurisdiction and A&D Fire Protection is not appropriate precedent to support dismissal of this protest.

pre-award objections to a solicitation and post-award objections to a contract. The third prong of the Tucker Act's jurisdictional grant is necessarily broader, since it is not limited to objections to an actual solicitation or award, but to any violation "in connection with" a procurement, or even a proposed procurement. That language is to ensure that the procurement process is conducted in accordance with applicable laws and regulations so that potential bidders are not improperly excluded from opportunities to compete for federal procurements. If not for this third prong, the exclusion of potential bidders prior to their opportunity to bid on a solicitation would preclude any challenge to the Government's actions, even though if those actions had occurred later in the process, after receiving responsive offers or bids, they would be subject to protest, based on the first two prongs in Subsection (b)(1) of the Tucker Act.

If the "in connection with" language does not provide some opportunity to challenge Government actions that occur at the beginning of a procurement process, the Government could routinely insert one of the many lead systems integrators, and other similar, large FSS contractors, and assign them procurement responsibilities. If that were to happen, without giving effect to the "in connection with" language, there would be no opportunity to review the procurement process from the time that the FSS contractor stepped in through the actual procurement of the goods and services. Moreover, if the Court were to conclude that once the Government assigns a lead systems integrator to conduct a procurement, that procurement is beyond review, then this Court will never be able to enforce OCI and bundling requirements, because those decisions are necessarily made before a procurement actually occurs and would be subject to challenge by contractors in the very same position as the Contractors in this case. The result would be that small businesses would have no recourse once the Government selects a surrogate to privatize its procurement duties.

This case illustrates the need for use of the "in connection with" language to preserve the Court's ability to review Government procurement violations when they occur at the beginning of the process. Here, the Government acted before issuing an RFP or RFQ to insert SRA into the process and task it with procurement. Once selected, the Government claimed that SRA had the full authority to handle the procurement process, all the way down to selection and actual purchase of the goods and services. AR 171-172. However, before the Government selected SRA to play a role in the procurement process and assigned to it the task of procuring the software packages at issue, the Government was required to make assessments regarding any OCI and any bundling requirements. The Contractors were not notified that SRA was even to play a role in the procurement process until it received the Second RFI from SRA on August 12, 2005. Because the Government had already decided to insert SRA into the procurement process without conducting any of the required analyses, there would be no opportunity to challenge that decision or even to determine whether the Government had conducted the required OCI and bundling analyses to justify its use of SRA in the first place. The only way for the Government's failure to conduct those analyses to be challenged is through a protest by a potential offeror in connection with the non-competitive procurement eventually conducted by SRA.

Allowing such a challenge is particularly important, given SRA's role in the ultimate procurement. Here, SRA allegedly conducted the procurement process. The Government has indicated that the process did not include any price consideration of the software packages offered. See AR 126. That process concluded with a "recommendation" of the products offered by Infoterra and CompuSearch. Under past Government practice, the Government would take that "recommendation" and issue an RFP or RFQ to obtain, if nothing else, some price comparisons. That did not happen here. AR 126 (after the "recommendation," SRA developed Rough Order of Magnitude Cost Estimates for the purchase of the software). Instead, the

Government simply approved the SRA "recommendations" and funded SRA's efforts to enter into contracts for the purchase of the Infoterra and CompuSearch software packages. By failing to conduct the OCI and bundling analyses, the Government approved "recommendations" that required it to expend more funds than necessary for integration work, to purchase a product from a foreign company, and to select a product from a company with ties to SRA, rather than the competent incumbent provider – all because of SRA's own unchecked interests in the procurement process.

In essence, then, the Government was able to avoid the required OCI and bundling analyses, and to conduct what amounts to a sole source procurement based upon SRA's tainted "recommendations," none of which, according to the Government, is reviewable by this Court. With all due respect, it is nonsensical that this Court's jurisdiction could be so easily circumvented by deliberate Government action at the beginning of a procurement process. That is the very purpose of the "in connection with" language – to ensure this Court's ability to review the entire procurement process, not just the end result. Such a jurisdictional grant allows the Court to ensure that the goal of CICA -- to ensure free and open competition -- is met.

C. The Court's Exercise Of Jurisdiction Is Important To Stem The Improper Use Of Large, FSS Contractors To Limit Competitive Procurements

The Government as a whole, as well as the federal procurement community, have already recognized the growing problem of the misuse of large, Federal Supply Schedule ("FSS") contractors for procurements usually reserved for small businesses. As the Contractors noted in their Complaint:

> The procurement violations resulting from the awarding of this "Task Order" by FEDSIM for USAID under SRA's Millennia contract are representative of the risk of misuse inherent in this type of interagency contracting method that has caused GAO to place interagency contracting into the January 2005 GAO High Risk Update (GAO-05-207). Congress is also concerned with interagency contracting, as evidenced by a congressional panel authorized by Section 1423 of

> the Services Acquisition Reform Act of 2003, which is examining interagency contracting.

Complaint, ¶ 14. In addition, numerous recent articles have expressed concern about the increased use of lead system integrators, which among other things, has lead to improper delegation of inherently governmental authority and organizational conflicts of interest. See, e.g., Steven L. Schooner & Christopher R. Yukins, Emerging Policy and Practice Issues, The George Washington University Law School Public Law and Legal Theory Working Paper No. 193, West Government Contracts Year in Review Conference (2005); Dan I. Gordon, Organizational Conflicts of Interest: A Growing Integrity Challenge, 35 Pub. Cont. L.J. 25 (2005); Dollars, Not Sense: Government Contracting Under the Bush Administration, Prepared for Rep. Henry A. Waxman by the United States House of Representatives Committee on Government Reform – Minority Staff, Special Investigations Division (June 2006), at 20.

Most recently, in the Senate Armed Services Committee Report, No. 109-254, regarding the National Defense Reauthorization Act of 2007, the committee commented on the increasing use of lead systems integrators, such as SRA:

> **Lead systems integrators (sec. 842)**
>
> The committee recommends a provision that would limit the participation of lead systems integrators (LSI) in the development or construction of any individual system or element of a system.
>
> ****
>
> ***The committee remains concerned with organizational conflicts of interest, the potential for a company to end up in a situation whereby the company is essentially evaluating itself or its competitors in making contract awards.*** The potential for organizational conflicts of interest continues to grow as the Department of Defense contracts for more work relating to acquisition, engineering, planning, integrating, or managing a system or systems as a major defense acquisition program.

S. Rep. No. 109-254, 109th Cong., 2d. Sess. (2006) (Emphasis added). As noted later in that same report, in testimony before the Subcommittee on Airland of the Committee on Armed

Services on March 1, 2006, the Government Accountability Office (GAO) stated: "And ideally, you'd want the LSI ***to be financially indifferent*** to the outcome of the program." Id. (emphasis added). These are but a few examples of the concerns arising from the misuse of lead systems integrators to circumvent procurement system safeguards. Congress had the foresight to imbue this Court with the "in connection with" jurisdiction to review these encroachments to the integrity of the federal procurement system and it is imperative that the Court exercise its jurisdictional grant.

## II. The Contractors are Interested Parties Prejudiced By The Government's Violations of Procurement Laws And, Therefore, Have Standing To Pursue Their Claims In Connection With The Proposed Procurement Of The Software Packages

The Government mentions, almost in passing, that the Contractors lack standing to pursue their claims and refers to the requirement of "interested party" status only in general terms. Motion to Dismiss at 20, 22. The Government's argument for lack of standing rests on two flawed premises. The Government claims that: (1) because the Contractors are subcontractors, as a result of the improper insertion of SRA as a prime contractor; and (2) because the Contractors failed to bid on the task order issued to SRA or on the underlying GSA Millenia contract from which the task order derives, the Contractors cannot establish "interested party" status. Motion to Dismiss at 22. The Government's argument once again mischaracterizes the Contractors' position and fails to address their actual grounds for establishing "interested party" status; therefore, the Government's arguments against standing are of no moment.

### A. The Contractors Are "Interested Parties" Challenging The Government's Decision To Use SRA For Non-Competitive Procurements Of The Software Packages

In Blue Dot Energy, this Court outlined the standards for establishing standing under similar circumstances. As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491 (b)(1); see 2004 U.S. Claims LEXIS 330, at *20. Under the

Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551, et seq., the term "'interested party,' with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with "interested party," as defined by the CICA, 31 U.S.C. § 3551. See Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also Banknote Corp., 365 F.3d at 1352. To qualify as an "interested party," the protestor must make two showings: (1) that it was an *actual or prospective bidder or offeror*; and (2) had a *direct economic interest* in the procurement. See Rex Serv. Corp., 448 F.3d at 1307 (emphasis added); Blue Dot Energy, 2004 U.S. Claims LEXIS 330, at *20. As applied in Blue Dot Energy, the Court found that, because Blue Dot was an offeror to the original solicitation, which the Government later cancelled in lieu of an improper, sole source procurement, and because, as a result, Blue Dot had "lost the economic opportunity of being awarded the contract," Blue Dot qualified as an "interested party." Id. at 21.

Here, there is no doubt that the Contractors are "interested parties." As set forth in their Complaint, Both DSI and STR have a connection to the procurement in that they both submitted qualifying proposals in response to the RFI process at issue, were prepared to submit bids pursuant to the anticipated Request for Quotation ("RFQ") or Request for Proposal ("RFP") flowing from the RFI process, and were competent to provide the goods and services procured. Complaint, ¶¶ 7, 9, 10, and 19. In fact, the Government has acknowledged that vendors such as the Contractors were capable of providing the software packages at issue, along with the integration services supplied by SRA. See AR 169. Also, they both have an economic interest in the procurement, in that both entities have lost a significant business opportunity by the

Government's decision to avoid the competition requirements for the software procurements at issue and which are collectively worth approximately ten million dollars. Complaint, ¶ 6; see Info. Sciences Corp. v. United States, 2006 U.S. Claims LEXIS 274, *70 (September 19, 2006); Cybertech Group, Inc. v. United States, 48 Fed. Cl. 638, 644 (2001). As a result, the Contractors are "interested parties" entitled to pursue their claims in this Court.[6]

B. The Contractors Were Prejudiced By The Government's Failure to Compete the Software Packages, Because They Had A Substantial Chance Of Receiving A Competitive Award To Provide Those Software Packages

The Government fails to assert any lack of prejudice to the Contractors as part of its argument against standing. Nevertheless, out of an abundance of caution, the Contractors will demonstrate that they have been prejudiced, as that term is understood for standing purposes.

In addition to establishing status as an "interested party," under 28 U.S.C. § 1491(b)(1), a protestor must also show that any alleged errors caused it "prejudice." See Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[T]o prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996 (alterations in original)); see also Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("prejudice (or injury) is a necessary element of standing.").

The United States Court of Appeals for the Federal Circuit has held that a protestor can establish prejudice by showing there was a "substantial chance" that it would have received the award if the procurement error was corrected. See Bannum, Inc. v. United States, 404 F.3d 1346,

---

[6] As an alternative ground for establishing jurisdiction and standing, as argued before the GAO, the procurement resulting from the Second RFI issued by SRA was essentially conducted "by" the Government. Therefore, for the same reasons set forth above – a direct economic interest in the lost opportunity to compete for the software procurements, and, the fact that they both responded to the Second RFI -- the Contractors are "interested parties" and have standing to pursue this protest. See discussion, infra; Complaint ¶¶ 6, 7, 13-26; AR 1, 127, 243, 266.

1351 (Fed. Cir. 2005) ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process."); see also Statistica, Inc. v. Christopher, 102 F.3d 1577 (Fed. Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a '*substantial chance*' that [it] would receive an award-that it was within the zone of active consideration." (internal citations omitted) (emphasis and alterations in the original)); see also Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (same) (citing CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (emphasis added)).

As this Court has noted, the question of prejudice turns, in part, on the relationship between the protestor(s) and the specific procurement process that is being challenged. Info. Sciences Corp., 2006 U.S. Claims LEXIS 274 at *69. Moreover, the United States Court of Appeals for the Federal Circuit has held that the issue of prejudice may be dependent upon the type of relief sought by the parties. In this case, the following standard is applicable:

> In Impresa [Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001,] we considered the standard to be applied where the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process). [] To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive. . . . [Plaintiff] need not show that it would have received the award in competition with other hypothetical bidders, [but rather] must show that it would have been a qualified bidder.

Myers, 275 F.3d at 1370 (citations omitted).

In their Complaint, the Contractors established that each of them would be prejudiced:

> Both Contractors are prejudiced, because they had a substantial chance of receiving the awards at issue, but for the Agencies' violations of the procurement laws and regulations. For the grants management software at issue, STR has the only system that has been successfully deployed by the Federal Government, which was one of the requirements for evaluation under the RFI process at issue. DSI is the incumbent provider of acquisition assistance software for USAID and, therefore, obviously would qualify as a competitive bidder for the new software procurement at issue, and would have a substantial chance of receiving the award

> based on its knowledge and experience of working directly with USAID's current system since 2000.

Complaint, ¶ 7. This is especially true since it now appears that both the Infoterra and CompuSearch products require substantially more integration work than would the STR and DSI products. In order to show prejudice, the Contractors need not show that they would have received a competitive award, but must merely establish that they were qualified bidders, which they undoubtedly were. As such, they were most certainly in the active zone of consideration, as evidenced by their participation in both RFI's, and their products' track record of positive performances. Complaint, ¶¶ 7, 9, 10, 19. Accordingly, both DSI and STR were prejudiced by the Government's failure to compete the two software packages at issue.

### C. Potential Subcontractors Have Qualified As "Interested Parties" Under Similar Circumstances

#### 1. Phoenix Air Group Provides The Proper "Interested Party" Analysis

In Phoenix Air Group v. United States, 46 Fed. Cl. 90 (2000), dismissed, 243 F.3d 555 (Fed. Cir. 2000), this Court found jurisdiction to hear a bid protest brought by a subcontractor. Phoenix Air Group provided air support to the United States Air Force, both as a prime contractor and, under a separate IDIQ contract, as a subcontractor. The Air Force needed additional services for an upcoming military exercise and initially decided to issue an RFP for those services. Due to a lack of funds, the Air Force cancelled the RFP and, instead, procured the additional services ostensibly under the IDIQ contract through issuance of a task order. Phoenix challenged the Air Force's task order procurement, claiming that, because the requested services should have been procured under a negotiated price line item in the IDIQ contract, instead of a fixed price one, the Air Force had essentially engaged in a sole-source procurement. Id. at 97.

Despite the fact that Phoenix was challenging an award of a task order and was a subcontractor for performance of the work pursuant to that task order, this Court easily found that Phoenix, by alleging a violation of the Armed Services Procurement Act, had alleged a violation of a statute in connection with a procurement. This Court also found that Phoenix qualified as an "interested party," primarily because it had submitted a bid to the cancelled RFP and was already performing comparable flight services for the Air Force, so it was obviously qualified to have received a contract award had the work been competitively procured. Id. at 101-02.

Phoenix Air Group is clearly analogous and supports the Contractors' claim that this Court has jurisdiction to hear its bid protest. Just as in Phoenix Air Group, the Contractors are positioned as subcontractors challenging the Government's failure to compete work that was, instead, issued by task order to a prime contractor, improperly causing the Contractors to be positioned as subcontractors. The only reason that the Contractors were in the position of subcontractors was due to the Government's violation of the relevant procurement laws and regulations. The Contractors provided responses to the First RFI, before the Government decided to change course and insert SRA as a middleman in the procurement process. The Contractors were anticipating issuance of an RFP or RFQ and would have submitted a bid for the work. Both Contractors were capable of providing the software packages at issue.

Thus, the Contractors could have provided the products and services at issue as a prime contractor, and, therefore, are challenging the failure to compete work they could have obtained directly. They are in a position of subcontractor at the end of the procurement process only because of the Government's violation of the procurement laws; but for those violations, the Contractors would have been in a position to bid directly with the Government for the

procurements at issue. They, therefore, qualify as "interested parties" for the same reasons as set forth in Phoenix Air Group.

As this Court cautioned in CCL, "judicial review of procurement methods should not be thwarted through the wooden application of standing requirements." 39 Fed. Cl. at 790. To adhere to that admonition, the Court should not be swayed by the Government's repeated use of the term "subcontractor," and instead, should find that, under the circumstances applicable to this protest, the Contractors have established standing.

2. The Government's "Interested Party" Authorities Are Inapposite

To the extent that the Government is challenging the Contractors' standing, the Government relies on Eagle Design & Management, Inc. v. United States, 62 Fed. Cl. 106 (2004), in support of its position that the Contractors, as "subcontractors," lack "interested party" status. Motion to Dismiss at 22. Eagle Design involved a true subcontractor, objecting to the Government's failure to award a solicitation to its prime contractor, which was disqualified for failing to meet the "small business" definition. Id. at 106. The subcontractor admitted that it did not submit its own bid and did not intend to do so. As the Court noted, "Eagle Design does not allege that it would have been an offeror but for SBA's erroneous decision here." Id. Not surprisingly, the Court found that the subcontractor was not an "interested party", primarily because Eagle Design was not an actual or prospective offeror.

Such is not the case here, as both DSI and STR responded to the First RFI and fully anticipated that the Government would eventually issue an RFI or RFQ, to which both Contractors would have responded. Furthermore, as noted above, both were capable of responding and receiving the award for the software packages. Complaint, ¶¶ 7, 9, 10. Thus, Eagle Design is inapposite, given the distinguishing facts at issue in this protest.

The Government's additional argument against standing, based upon Waste Management of North America, Inc. v. Weinberger, 862 F.2d 1393, 1398 (9th Cir. 1988), that the Contractors failed to bid on the relevant SRA task order implicated in this protest or the underlying Millennia contract, is equally unavailing. This argument completely misses the basis of the Contractors' claims. As set forth above, the Contractors are not challenging the Government's issuance of a Millennia contract to SRA, nor are they challenging the award of a task order to SRA, as opposed to some other IDIQ contractor. Instead, the Contractors are challenging the Government's failure to compete the procurement of the software packages at issue, and its delegation of that procurement responsibility to SRA, all without any explanation or justification for doing so in violation of relevant procurement laws and regulations. None of the cases cited by the Government address the same set of circumstances as alleged by the Contractors.

## III. The Government's Motion to Dismiss Addresses Only The Contractors' Alternative Ground For Establishing Jurisdiction – As Nominal Subcontractors Challenging The Government's Role in the "SRA Procurement"

The Government's Motion to Dismiss does not address at all the Contractors' assertion of jurisdiction to challenge the Government's decision to utilize SRA, instead of engaging in a competitive procurement process. In fact, the Government never even references the jurisdictional language at issue -- "in connection with a procurement or a proposed procurement." Instead, the bulk of the Government's Motion focuses on the Contractors' alternative ground for jurisdiction – that because the Government so controlled the procurement ostensibly conducted by SRA, that the Contractors, as nominal subcontractors, are entitled to pursue a bid protest directly against the Government. The Government states that "in order to proceed under an agency theory, DSI and STR would have to establish the three criteria set forth in Johnson Controls." Motion to Dismiss at 16. The Government's sweeping statement is incorrect.

The Contractors offered two theories of jurisdiction, both of which were presented to the GAO. First, the GAO, this Court and other courts have all recognized circumstances under which a "subcontractor" may maintain a bid protest action against the Government. Typically, these circumstances involve a procurement that is controlled by the Government to such a degree that the prime contractor is a mere "agent" of the Government, allowing the subcontractor to protest the Government's conduct of the procurement. There is a second, well-defined exception to the prohibition against subcontractor bid protests; when the prime contractor acts as the "purchasing agent" for the Government, based upon the factors set forth in Johnson Controls. Not only can the Contractors satisfy the Johnson Controls criteria, but Johnson Controls provides another ground for jurisdiction, unaddressed by the Government – when the Government is "otherwise in privity" with the protesting subcontractor.

## A. Even If The Court Were To View This Protest As One Challenging SRA's Conduct In Connection With The Second RFI, The Contractors Still Can Establish Jurisdiction And Standing To Pursue Their Protest

As stated above, the Government has simply mischaracterized the Contractors' protest as a challenge to SRA's Second RFI and ultimate purchase of the software packages at issue. However, even if the Court were to view the protest as such, the Contractors would still be able to establish jurisdiction in this Court, since SRA was acting as a mere agent of the Government, which remained in charge of the procurement. The GAO has found jurisdiction under CICA to hear subcontractor protests when the procurement, although conducted by a prime contractor, was actually done "by" or "for" the Government. See Ocean Enterprises, Ltd., 65 Comp. Gen. 585, 586 (1986); Optimum Systems, Inc., 54 Comp. Gen. 767, 772-74 (1975); ToxCo, Inc., Comp. Gen. Dec. B-235562 (August 23, 1989), 89-2 CPD ¶ 170. "Although not binding on this court, GAO decisions are of interest to the court and are often referred to by the court as persuasive authority "in recognition of GAO's expertise in resolving contested procurement

decisions." CSE Constr. Co. v. United States, 58 Fed. Cl. 230, 256 (2003) (citing Tel-Instrument Elecs. Corp. v. United States, 56 Fed. Cl. 174, 177 n.2 (2003)). Therefore, these GAO subcontractor protest cases provide this Court with proper guidance to find the Contractors have jurisdiction to pursue their protest, even if considered a protest of an actual award under the language of the Tucker Act, instead of the "in connection with" language regarding the procurement process, as outlined above.[7]

B. The GAO's Analysis Of Procurements "By" Or "For" The Government Supplies This Court With Jurisdiction

As noted in the GAO protests, the GAO retains jurisdiction over subcontractor protests where the procurement is actually "by" the Government, with a prime contractor serving merely as a conduit for the procurement and handling the procedural aspects of that procurement. Addison Constr., Inc. B-293805, April 20, 2004, 2004 CPD ¶ 105 (citing RGB Display Corp., B-284699, May 17, 2000, 2000 CPD ¶ 80)). The GAO considers a subcontract procurement to be "by" the Government "where the agency handled substantially all the substantive aspects of the procurement and, in effect, "took over" the procurement." Addison Constr., Inc. CPD at ¶ 105 (citing St. Mary's Hosp. and Med. Ctr. of San Francisco, Calif., B-243061, June 24, 1991, 1991 CPD ¶ 597)). In St. Mary's, the GAO described a similar set of facts and found that it had jurisdiction of a subcontractor protest. St. Mary's involved a prime contractor (the "Foundation") that issued an RFP, which contained certain criteria. The Foundation wrote to two bidders and asked for additional information not covered in the original RFP. The Navy Commander created a committee to choose the provider. The Committee was comprised of members of the VA med center, the USAF med center, and the chief of cardiology at Letterman

[7] Because of the Government's extensive involvement in the "SRA procurement," the Court would also have jurisdiction to hear the Contractors' protest challenging the Government's conduct "in connection with" SRA's procurement.

Army Med Center (where the new program would be implemented). The Foundation had one representative on the committee. The chairman of the committee prepared evaluation criteria (not included in the RFP) to be used to evaluate the offers. The committee reviewed the proposals and voted for the awardee. The recommendation was approved by the Commander, who advised the Foundation. The Foundation entered into an agreement with the hospital to provide cardiac surgery services, which costs would be borne by the Foundation.

As the GAO explained:

> Under the CICA, our Office has jurisdiction to decide protests involving procurements by federal agencies. Procurements by government prime contractors generally are not viewed as procurements by federal agencies. See, e.g., ToxCo, Inc., 68 Comp. Gen. 635 (1989), 89-2 CPD ¶ 170. In some cases, however, the prime contractor is merely acting "by or for the government." In such cases, we will assume jurisdiction. 4 C.F.R. § 21.3(m)(10). One such case is where the government's involvement in the subcontractor selection is so pervasive that the contractor is a mere conduit for the government. See University of Mich.; Indus. Training Sys. Corp., 66 Comp. Gen. 538, [June 30, 1987, 87-1 CPD ¶ 643]; Aviation Data Serv., Inc. -- Recon., B-238057.2, Apr. 11, 1990, 90-1 CPD ¶ 383. Although Foundation technically is itself a subcontractor here, we take jurisdiction because we find that the government's involvement was so pervasive in this procurement ostensibly conducted by Foundation that Foundation was a mere conduit for the government and that the government "took over" the procurement from Foundation. See Perkin-Elmer Corp., Metco Div., B-237076, Dec. 28, 1989, 89-2 CPD ¶ 604.
>
> Although Foundation issued the solicitation, received proposals, asked offerors for additional information, and notified offerors of interview sessions and of the award decision, every meaningful aspect of the procurement for cardiac surgery services, involving evaluation of proposals and selection of a contractor, was controlled by government officials.
>
> * * *
>
> [T]he record shows that Foundation performed the procedural aspects of the procurement, but that the substantive aspects were performed by the government such that the selection of the cardiac surgery provider was, in effect, by the Department of Defense. Foundation, by virtue of its contractual status . . . served only as a conduit or "middleman" between various components of the Department of Defense . . . and the awardee.

St. Mary's, *10-12. See also Univ. of Mich.; Indus. Training Sys. Corp., 66 Comp. Gen. 538 (1987), 87-1 CPD ¶ 643). For the same reasons cited in St. Mary's, this procurement is clearly "by" the Government and SRA served merely as a conduit for purchase of acquisition software by the Government, circumventing the procurement laws designed to prevent the very purchase without competition that is at issue here. The RFI was prepared primarily by the Government; in fact, the Second RFI, issued by SRA, contains only minor, technical changes to the First RFI. SRA then served on a committee with the Government's representatives. However, that committee, the Source Selection Evaluation Team ("SSET"), was divided into two sections, one for evaluation of the products comprised completely of government personnel, and the other, for technical assistance, comprised of SRA representatives. AR 198-202; see AR 149-151; 155-156. The head of the Source Selection Authority ("SSA"), the one with final authority to accept the "recommendations" resulting from the RFI process, was a government representative. AR 736, 749. In addition, in its own documents, SRA has also acknowledged that it procured the software on behalf of the Government, and that the Government will eventually own the software. AR 147. This pervasive involvement of the Government in the RFI and "recommendation" process, along with SRA's admission that it is procuring the software for the Government, which will eventually own it, clearly demonstrates that the substance of this RFI process was conducted "by" the Government. Accordingly, this Court has jurisdiction to hear this protest, based on the cited Comptroller General opinions.

C. The Government's Motion To Dismiss Focuses Primarily On An Inapposite Theory Of Jurisdiction Under the Johnson Controls Test

The bulk of the Government's Motion to Dismiss (pages 14-20) focuses on the Johnson Controls test, which provides subcontractors with protest rights if they can satisfy a three-prong test: where the prime contractor is "(1) acting as a purchasing agent for the government; (2) the

agency relationship between the government and the prime contractor was established by clear contractual consent; and (3) the contract stated that the government would be directly liable to the vendors for the purchase price." Bluewater Environmental, Inc. v. United States, 60 Fed. Cl, 48, 53 (2004) (citing United States v. Johnson Controls, Inc., 713 F.2d 1541, 1551 (Fed. Cir. 1983)). In analyzing the Johnson Controls test, the Government focuses on the fact that the Contractors submitted proposals to SRA's Second RFI, which would have placed them in the position of subcontractors had they been "recommended" to provide the software packages at issue. The Government spends several pages making two fairly obvious points: that SRA is not a federal agency and that the Contractors allegedly would not have had actual privity of contract if "recommended" to supply the software packages, since the current providers entered into written subcontracts with SRA. Motion to Dismiss at 11-13. Of course, the Contractors are challenging the fact that the Government improperly used SRA to conduct the procurements at issue and are relying primarily upon the "in connection with" language in the Tucker Act to support their claims of jurisdiction. Johnson Controls, on the other hand, arose from a challenge under the Contract Disputes Act. U.S. West Communication Services, Inc. v. United States, 940 F.2d 622 (Fed. Cir. 1991), similarly concerns a protest under the Contract Disputes Act. Bluewater, also cited by the Government, apparently applied the Johnson Controls test to deny a subcontractor's protest for lack of jurisdiction for failing to establish the Johnson Controls criteria. All three of the cases cited by the Government involve M&O contractors managing Department of Energy sites. Because of this fact and the lack of discussion of the jurisdictional language at issue here – the violation of a statute or regulation "in connection with a procurement or a proposed procurement" – the Johnson Controls line of cases are simply inapposite.

D. Even Under Johnson Controls, The Contractors Can Establish Jurisdiction Because of SRA's Role As Purchasing Agent For the Government

Even assuming that the Court found the Johnson Controls test applicable, the Contractors satisfy the necessary criteria and, therefore, have an additional ground for establishing jurisdiction in this Court. First, SRA's own documents confirm that it was acting as the Government's purchasing agent. AR 659. SRA admitted that it was procuring software for eventual ownership by the Government. AR 149. In fact, part of its assignment, so it claims, was to purchase software to be used by the Government. Second, this agency relationship was clearly consensual; by accepting the task order from USAID, SRA was committing to purchase software for the Government and agreed to integrate that software within the Government's existing technology. Moreover, the "subcontractor" was responsible for providing maintenance services for its software directly to the Government, rendering SRA a mere agent in procuring those services. AR 668. Similarly, in order to use the software, the Government was required to enter into a licensing agreement directly with the "subcontractor." AR 668. SRA clearly consented to their agency relationship, as evidenced by the task order and the subsequent SRA documents developed during the "recommendation" process. That process involved SRA "recommending" a product for use by the Government and the Government then requesting that SRA procure the software by entering into a subcontract directly with the software provider.

As for the final requirement, it is true that SRA apparently has committed to pay the subcontractors directly, but the Government must authorize any such payments. AR 659. Johnson Controls has little vitality if the Government can simply ask a supply schedule prime contractor to procure goods for use by the Government, commit to pay the prime for the goods, but require the prime to enter into a subcontract for purchase of the goods, rather than purchase them directly, and by doing so, avoid any bid protest oversight. Here, the Government asked SRA to purchase software for the Government's use; it obligated funds to pay SRA, which, in

turn, used that money to pay the subcontractor. In this type of pass-through arrangement, the third prong of Johnson Controls must be satisfied. Accordingly, even under the Johnson Controls test, this Court has jurisdiction to hear the Contractors' bid protest.

E. The Contractors Are "Otherwise In Privity" With The Government

Johnson Controls established yet another ground for subcontractors to establish jurisdiction in this Court. As set forth in Lockheed Martin Corporation v. United States, 48 Fed. Appx. 752, *9 (September 30, 2002), Johnson Controls delineated four factors in the "otherwise in privity" test for determining whether the subcontractor could sue under the CDA:

> (1) whether the subcontractor and the government had ever had a direct contractual relationship; (2) whether the subcontract with the prime contractor contained an "ABC" clause (i.e., an express disclaimer of privity of contract between the subcontractor and the government); (3) whether the prime contractor was required to obtain a Miller Act payment bond, thereby providing a recourse by the subcontractor other than a direct appeal; and (4) whether there was any provision in any of the contract documents that clearly authorized a direct appeal . . . by the subcontractor.

Id. (citing RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1139 (6th Cir. 1996) (Johnson Controls, 713 F.2d at 1553)). Again trying to utilize the incomplete administrative record it provided, the Government suggests that there is no evidence of an agency relationship and even suggests that "there is no provision under the subcontracts or the prime contract, which establish that the Government would be directly liable to SRA's subcontractors." Motion to Dismiss at 19. A review of the current record indicates that statement is wrong. First, both of the Contractors have, in the past, had a direct relationship with the Government. STR provides a grants management system for the Department of the Interior, including a direct licensing and maintenance agreement with the Government. DSI is the incumbent contractor in a current contractual relationship with USAID.

Second, there are strong indicia of Government control throughout the procurement process. As cited earlier, there is evidence of Government control of the evaluation team and

Government control of the final procurement decision. AR 198-202, 736, 749; see AR 149-151; 155-156. In addition, SRA indicated that it merely "supported" the Government's decision and that it was procuring goods on behalf of the Government for eventual Government ownership. AR 118, 149.

Third, the subcontracts shed further light on the Government's control of the procurements at issue. Under the "Payment" section, the Infoterra subcontract specifically states that **"[a]s SRA acts as agent for USAID on this subcontract**, acceptance and approval from USAID must be obtained by SRA in order to dispense payments. . . ." AR 659 (emphasis added). There could be no clearer statement that the Government is in control of the superficial contractual relationship between SRA and the subcontractors. In addition, the subcontracts reference that an authorized representative of SRA "which may include USAID," has authority to test and inspect the subcontractors' work. AR 654. The subcontracts also contemplate a direct contractual relationship between the subcontractors and the Government for maintenance and/or lease agreements (AR 668); they also require an "acknowledgement of USAID funding" for subcontractors (AR 676), and the Government must approve any personnel changes, as well as any travel expenses (AR 645, 683).[8]

As a result of the very limited administrative record submitted by the Government, there are enough indicia of Government contractual control to foil the Government's plan to have its cake and eat it too; that is, to keep control of its procurements, yet place SRA in the middle and claim that, therefore, those procurements are beyond the protest provisions of the federal procurement process. Accordingly, under the "otherwise in privity" test set forth in Johnson

---

[8] Furthermore, the Compusearch Subcontract references an "Attachment II to RFP." AR 680. The Contractors are unaware that any such RFP was ever issued. If so, they were not afforded an opportunity to compete for the work encompassed by that RFP.

Controls, there is clear evidence of a relationship with the Government sufficient to warrant this Court's acceptance of jurisdiction.

## IV. The Contractors Have Stated Claims Upon Which Relief Can Be Granted

The Government's Motion to Dismiss pursuant to RCFC 12(b)(6) for failure to state a claim does not identify any alleged deficiency in any of the six claims alleged in the Contractors' Complaint, other than its general position that this Court lacks jurisdiction to resolve any of the Contractors' claims. Therefore, the Contractors will not address and provide detailed support for each specific claim. However, based on the Complaint, the Contractors have alleged violations of a number of statutes and regulations regarding the federal procurement system, including CICA and the Small Business Act, and regulations requiring an analysis of potential organizational conflicts of interest and bundling. Complaint, ¶¶ 5, 27-49, 55-58. The Contractors have also stated a claim for the bad faith conduct of the procurement process by the Government. Complaint, ¶¶ 50-54. Should the Court decide to assess each of those claims in the context of resolving the Government's Motion to Dismiss, the Contractors request leave to file a supplemental memorandum in opposition to the Government's Motion to Dismiss, in order to demonstrate the legal validity of each of the claims contained in the Complaint.

## CONCLUSION

For the reasons set forth herein and in their Motion to Supplement the Administrative Record and Reply to the Government's Opposition to the Motion to Supplement the Record, Plaintiffs, DSI and STR, respectfully request that the Court deny the Government's Motion to Dismiss, grant their pending Motion to Supplement the Administrative Record, require the Government to provide all requested documents in that Motion, allow Plaintiffs to conduct limited discovery to obtain other information requested but not set forth in any documents, and provide Plaintiffs with all other relief to which they are justly entitled.

DISTRIBUTED SOLUTIONS, INC.
and STR, L.L.C.

By: s/ Thomas A. Coulter
Counsel

Dated: November 13, 2006

Thomas A. Coulter (Virginia State Bar No. 46532)
(D.C. Bar No. 436423)
LeCLAIR RYAN, a Professional Corporation
951 East Byrd Street-Suite 800-East Tower
Richmond, Virginia 23219
Mail: P.O. Box 2499
Richmond, Virginia 23218-2499
Telephone: (804) 916-7103
Facsimile: (804) 916-7203
Email: thomas.coulter@leclairryan.com