# In the United States Court of Federal Claims

No. 06-466 C
(**Originally Filed Under SEAL**:  April 13, 2012)
(**Filed:** May 2, 2012)

| | |
|---|---|
| DISTRIBUTED SOLUTIONS, INC.,<br>     AND STR, L.L.C.,<br>               Plaintiffs,<br>     v.<br>THE UNITED STATES,<br>               Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Protest of pre-procurement decisions made in connection with determining a need for property or services. |

---

## OPINION[1]

*Thomas A. Coulter*, Richmond, VA, for plaintiffs.

*William J. Grimaldi,* Department of Justice, Washington, D.C., with whom were Assistant Attorney General *Tony West*, *Jeanne E. Davidson*, Director, and *Harold D. Lester, Jr.*, Assistant Director, for defendant.  *Rene Dupuy*, USAID, of counsel.

**Merow**, *Senior Judge*.

*Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008) remanded this case for further proceedings, holding that the determination of the United States Agency for International Development (USAID) and the Department of State (DoS) to forego direct procurement of computer software products and instead task an existing contractor to procure the required software products, was within this court's procurement protest jurisdiction under 28 U.S.C. § 1491(b)(1).  On

---

[1]  This Opinion was originally filed under seal on April 13, 2012. (ECF No. 120.)  The parties were afforded an opportunity to propose redactions.  By separate filings on April 30, 2012 (ECF Nos. 121, 123), the parties stated that no redactions were proposed.  Accordingly, the sealed and public versions of this Opinion are identical, except for the publication date, the addition of catchwords and some minor, non-substantive edits.

remand, following lengthy settlement attempts, cross motions for judgment on the administrative record (AR) were filed and are now before the court.

## I. Facts

USAID and the DoS planned to develop common computer platforms – the Joint Acquisition[2] and Assistance[3] Management System program (JAAMS) to coordinate "dispersed acquisition and assistance functions in more than 250 missions and posts around the world." (AR 169.) As part of budget processes, acquisition alternatives were analyzed to "make an informed decision regarding the acquisition strategy."[4] (AR 170.)

To gather data to develop acquisition strategies, on June 27, 2005, USAID and DoS, assisted by SRA International, Inc. (SRA), issued a Request for Information (RFI #1)[5] "to research possible commercial off-the-shelf [COTS] Acquisition and Assistance (A & A)[6] solutions for JAAMS." (AR 16.) An objective of RFI #1 was "to select and implement acquisition and assistance solutions that meet the unique

---

[2] Generally, an acquisition management system would be used by the agency to order material and supplies.

[3] Generally, an assistance program manages requests for economic and other assistance from foreign nations.

[4] The Declaration of Linh T. Lam, certified Project Manager for the JAAMS program, details the history. (AR 168-72.)

[5] SRA was tasked with assisting in the development of RFI #1 under its PRIME 2.2 contract. (AR 174-75.) SRA was one of nine contractors granted a General Services Administration (GSA) Millennia Government Wide Acquisition Contract (GWAC), to provide technical services and support for Information Technology (IT) in software engineering/management, communications, and/or systems integration. (AR 123-24, 174-75, 758-840.) Systems integration included "[a]cquir[ing] or develop[ing] hardware, software, applications, interface, and connectivity components" and "[i]ntegrat[ing] all components." (AR 762.) On November 6, 2003, USAID issued a task order to SRA for integration support services. (AR 178-91.) Thereunder, SRA was to "[s]upport USAID's acquisition and assistance function used for contracts and grants world-wide" and "[i]ntegrate [commercial off-the-shelf (COTS)] packages from various vendors." (AR 186.) *See* 48 C.F.R. § 2.101. Plaintiffs do not dispute defendant's representation that the task order was issued to SRA.

[6] A&A referred to both projects – acquisition and assistance.

functional requirements of both organizations and can be fully integrated with the respective financial management systems." (AR 16.) Responding vendors were to submit a self-assessment and demonstrate their products "for market research purposes only." (AR 27.) RFI #1 warned that it would "not result in a contract award." (*Id*.) Rather, the agencies would "review the results of the vendor self-assessments and the presentations to determine the next course of action for the JAAMS effort." (*Id*.) Detailed product descriptions were required; specific pricing was not. (AR 29-34.) Responses were due July 8, 2005. (AR 631.)

A July 25, 2005 draft Acquisition Strategy stated that two "near-term acquisitions" were contemplated: (1) an RFQ [Request for Quotations] for all necessary software for the JAAMS project; and (2) a modified or new task order to SRA for its "new JAAMS role." (AR 1090, Pls.' Mem. Supp. Mot. J. AR,[7] ECF No. 78-6.) Alternatives included using an existing integrator (presumably SRA) or a new "Prime Integrator." (AR 1087.) An earlier draft Analysis of Alternatives, dated July 23, 2005, contemplated an "RFP [Request for Proposal] and Award (if necessary)." (AR 1091, 1096.) RFP evaluation criteria were detailed. (AR 1097-99.)

Plaintiff STR, L.L.C. (STR) is a small business that sells COTS software products including for grants management. STR has supplied software to other federal agencies and is a schedule 70 Federal Supply Schedule contractor. STR responded to RFI #1 on July 8, 2005, offering its COTS grants management software, eGrantsPlus®. (Compl. Ex. 2, AR 390-518.) STR also made a presentation to agency representatives. (Compl. ¶ 12.)

Plaintiff Distributed Solutions, Inc. (DSI), also a small business, responded to RFI #1 on July 8, 2005, offering its COTS Pro-Doc version 5 acquisition assistance software. (Compl. Ex. 3.) DSI was the incumbent provider of USAID's then-existing acquisition assistance software. (Compl. ¶¶ 10-11, 24.)

Submittals were also made by several other vendors. Upon review of the data received in response to RFI #1, the agencies decided to utilize the existing November

---

[7] AR1046-1162, attached to Plaintiffs' Memorandum in Support of Motion for Judgment on the AR (ECF No. 78), was produced by defendant in response to Plaintiffs' Motion to Supplement the AR (*id*. at 10 n.3) and is accepted by the court as part of the AR in this matter, as marked by defendant. (Order, ECF No. 105.)

6, 2003 task order to SRA to procure both types of software products and integrate them into the agencies' existing computer platforms.

An August 4, 2005 USAID draft Acquisition Plan refers to an "RFQ" for the software procurement. (AR 1064, 1072, 1075-76.) Vendors would be requested to provide "a written proposal to include cost" from which a "[a] best value award will be made." (AR 1073.) Also, "[c]ompetition for the implementation of JAAMS will be conducted in accordance with the Federal Acquisition Regulation (FAR) Part 8.04[8] [sic]." (AR 1072.) From these documents, plaintiffs contend that a competitive direct procurement was planned before SRA was injected into the process.

Following RFI #1, the agencies' August 12, 2005, PowerPoint presentation, JAMS/PSIP[9] Acquisition Strategy (AR 1132-62) planned to "issue a solicitation for software against which vendors could respond." (AR 1160.) The vendor distribution list for grants software included plaintiffs STR and DSI and three others, chosen as a result of the market survey, RFI #1. (AR 1161.) The list of vendors for acquisition software included DSI and three others, also selected as a result of the market survey of RFI #1. (AR 1162.)

From the responses to RFI #1, the agencies determined that:

[USAID and DoS] jointly conducted a market survey of COTS products covering both functions in July 2005. The survey showed that no single vendor provided grants and assistance functionality as well as procurement functionality that optimally met the needs of both agencies. Additionally, the field of vendors providing both these functionalities is very small. Therefore, the needs of both agencies are best met by selecting separate software solutions for each function. The survey also showed that integrators were willing to integrate any combination of software products, but, that none had strong experience in any one package, or combination of packages. As a result, the existing JAAMS/PSIP integrator will be used based on their familiarity with agency processes, requirements and legacy systems. The integrator will

---

[8] There is no FAR Part 8.04; the reference appears to be to FAR Subpart 8.4 – Federal Supply Schedules.

[9] Any difference between JAAMS and JAMS does not appear to be significant to this protest.

implement the selected grants and assistance system, and the selected procurement system (including simplified acquisitions, eCatalogs and large contracts).

(AR 1116.)  It was also determined that "USAID and State [] implement the same Assistance solution (JAMS), while USAID will implement a separate Acquisition solution from DoS, (PSIP)." (AR 170 (parentheticals in original).)  However, while determining each software product should be procured separately, the agencies assigned both software product acquistions to SRA, along with the necessary integration.

A Joint USAID/DoS Action Memorandum Requesting Approval to Implement JAAMS/PSIP Acquisition Strategy declared that SRA would manage the procurement and act as an advisor to the agencies, but the agencies would make the final acquisition decisions:

> In order to identify software vendors that best meet both sets of requirements a procurement will be undertaken.  The procurement will be **managed by the prime integrator** and will be issued to vendors who meet minimum requirements.  Proposals will be evaluated jointly by both agencies for grants and assistance and by USAID with consultation from DoS for procurement.  Both evaluations will be **advised by the integrator.**

(AR 1116 (emphasis supplied).)   Both DoS and USAID approved the Action Memorandum for "the aforementioned strategy for the purchase of software" on August 12 and September 15, 2005, respectively.  (AR 1117.)

On August 12, 2005, USAID and DoS approved a Source Selection Plan.  (AR 1102-15.)  Plaintiffs point to Plan provisions that confirm the agencies' continued decision-making in SRA's ostensible software selections.  The Plan refers to SRA as an integrator and "[a] solicitation will be issued to obtain the software product(s) for [A&A] functions selected by the government."  (AR 1107, 1123.)  USAID and DoS would evaluate and select the products with SRA and other private contractors to

advise on an "as needed" basis.[10]   (AR 1108, 1114-15, 1124, 1130-31.) "[Non-Government Advisors such as SRA] . . . do not evaluate or rate proposals." (AR 1114-15.)  Nevertheless, SRA would have contractual privity with vendors selected. (AR 1107.)  The "source selection evaluation team (SSET) will adhere to the principles in FAR Subpart 15.3" based on evaluation factors "described in the solicitation to be issued by the Prime 2.2 integrator."  (AR 1108, 1124.)

In a JAAMS Update dated August 12, 2005, USAID[11] informed all vendors that had responded to RFI #1 that "[b]ased on the results of the reviews and demos, the Government has decided to pursue alternative courses of action.  The Government sincerely thanks all the vendors that participated by submitting responses to the RFI and conducting demos."  (AR 37, 639.)

The same day, August 12, 2005, SRA issued a similar RFI (RFI #2).  (AR 289-389.)  RFI #2 sought

> to collect information on the following types of [COTS] products:
> • a single assistance system for State and USAID,
> • an acquisition system for USAID, and
> • an e-catalog system for USAID.

(AR 292.)  RFI #2 "request[ed] information from selected vendors to obtain more detailed information on commercially available [A&A] system(s) or combinations thereof, to satisfy USAID and State's requirements."  (*Id*.)  RFI #2 specified that the selected vendors may become subcontractors to SRA:

> The selected product vendor(s) may serve as subcontractors to the current USAID system integrator, [SRA] under the PRIME 2.2 contract. In this role, the subcontractor will provide software product(s) and

---

[10] The organizational chart of the source selection organization and list of team members is attached as Appendix A to this Opinion.  Listed as non-government advisors are SRA, Accenture, Booz Allen Hamilton and LMI.  (AR 1127-31.)

[11] "USAID was designated the lead agency for this joint program." *Distrib. Solutions, Inc. v. United States*, 76 Fed. Cl. 524, 525 (2007), *rev'd on other grounds*, 539 F.3d 1340 (Fed. Cir. 2008).

services to support the integration effort as requested and funded under the direction and management of SRA.

(*Id*.)

In response to RFI #2, plaintiff DSI proposed its acquisition assistance software products[12] and plaintiff STR proposed and demonstrated its grants management software products.

SRA ostensibly "conducted" the procurements "on behalf of the Government," as the government would be the "eventual owner of the software." (AR 147.) In an October 25, 2005 PowerPoint presentation, "JAMS/PSIP Background and Acquisition Strategy," the selection organizational chart for both software products depicts SRA as an advisor to the agencies' evaluation team. (AR 1051, 1056.) The Source Selection Authority (SSA) would "ensure that responses are evaluated based solely on the factors and subfactors contained in the solicitation" and "[s]elect the source or sources whose response is the best value to the Government." (AR 1057.) SSA's decisions would "include the rationale for any business judgments and tradeoffs made, including benefits associated with additional costs; however, that documentation need not quantify the tradeoffs that led to the decision." (*Id*.) Although the vendor selections would be executed by SRA, USAID and DoS would jointly select the chosen products. "Though the vendor selection is being executed by SRA, USAID and State are jointly selecting the chosen products and the selection was based on a thorough requirements definition, market research, demonstration, and solution review process." (AR 1061.) Other sources confirmed that the agencies made the decision. (AR 149, 151, 156.) [13]

In an October 3, 2005, letter SRA informed STR that its product was not "recommended" by SRA for acquisition by USAID. (AR 118.)

---

[12] DSI was the incumbent provider of acquisition assistance software for USAID. (Compl. ¶ 7.)

[13] This procedure differs substantially from the customary practice whereby a prime contractor obtains, and then relies upon, quotations from potential subcontractors prior to preparing its bid to the government. *See Hoel-Steffen Constr. Co. v. United States*, 231 Ct. Cl. 128, 684 F.2d 843 (1982).

An October 31, 2005 USAID Memorandum includes the recommendation of the SSET that Compusearch's PRISM be approved by the SSA for the acquisition assistance software. (AR 736-53.) Responding vendors evaluated included DSI. (AR 738, 743, 754-57.) On November 8, 2005, DSI was notified that its product would not be recommended by SRA for acquisition by USAID, and that Compusearch's PRISM system was chosen. (AR 244, Compl. Ex. 10.) On February 1, 2006, SRA signed a Time and Materials subcontract with Compusearch Software.[14] (AR 680-735.)

The chair of the SSET and those making the final procurement decisions were all government representatives. (AR 736-50.) On November 9, 2005, SRA entered into a subcontract with Infoterra, Inc., a Canadian firm, to provide assistance management software products for joint use by USAID and DoS. (AR 641-79.) In that subcontract, SRA is identified as a government agent. "As SRA acts as an agent for USAID on this subcontract, acceptance and approval from USAID must be obtained by SRA in order to dispense payments for the IT services performed and the deliverable products presented." (AR 659.)

## II. **Procedural history**

Plaintiffs filed separate protests with the General Accountability Office (GAO), STR on October 13, 2005, and DSI on November 18, 2005. (AR 1-118, 243-258.) The GAO dismissed STR's protest on December 22, 2005, concluding that SRA was not acting on the government's behalf within the parameters of the tests articulated in *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed. Cir. 1983). (AR 238-42.) "[T]he procurement here was not 'by' the government." (AR 242.) DSI's protest was dismissed on the same grounds on January 25, 2006. (AR 282-88.) "[T]he procurement at issue was not conducted by a federal agency or a contractor acting as a procurement agent for a federal agency and thus is not subject to our jurisdiction." (AR 282.)

---

[14] The Subcontract Agreement contains a clause denying any privity of contract between the subcontractor and the government (AR 691), and that "[t]he cooperative team of USAID, SRA, and the subcontractor will integrate the Software. However, only SRA is authorized to direct the subcontractor with respect to the obligations, responsibilities, terms, and conditions of the subcontract awarded." (AR 709.)

Plaintiffs filed the action with this court on June 20, 2006. Finding the gravamen of plaintiffs' protests was directed at SRA's subcontract awards, defendant's Motion to Dismiss for lack of jurisdiction (ECF No. 16) was granted. The Federal Circuit reversed, concluding the agencies "initiated 'the process for determining a need,'" *Distributed Solutions*, 539 F.3d at 1346, in that RFI #1 was a market survey to gather data to determine an acquisition strategy, and the beginning of a procurement process, within the procurement protest jurisdiction granted to the Court of Federal Claims by the Tucker Act. Plaintiffs, as potential competitors under a direct procurement with USAID and DoS, were objecting to "alleged violation[s] of statute[s] or regulation[s] *in connection with a procurement or a proposed procurement.*" 28 U.S.C. § 1491(b)(1) (emphasis added). The Federal Circuit instructed that "'in connection with a procurement or a proposed procurement'" is "'very sweeping in scope.'" *Id.* at 1345 (quoting *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)). Accordingly, a "procurement includes all stages of the process of acquiring property or services, *beginning with the process of determining a need* for property or services and ending with contract completion and closeout," the Federal Circuit concluding plaintiffs' grievances fell in that continuum. *Id.* (emphasis in original) (internal quotation marks omitted) (interpreting definition previously codified at 41 U.S.C. § 403(2), now at 41 U.S.C. § 111).

> While the government ultimately decided not to procure software itself from the vendors, but rather to add that work to its existing contract with SRA, the statute does not require an actual procurement. The statute explicitly contemplates the ability to protest these kinds of pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over "proposed procurements."

*Distrib. Solutions*, 539 F.3d at 1346.

Plaintiffs possessed jurisdictional standing because they: (1) were prospective bidders; (2) had a direct and significant economic interest in the proposed direct procurement that was eliminated; and (3) alleged a number of statutory and regulatory violations in the decision to forego a direct procurement.

Assuming that [RFI #1] was part of the challenged procurement process, the contractors have established themselves as prospective bidders in

that they submitted qualifying proposals in response and, according to their complaint, were prepared to submit bids pursuant to the anticipated Request for Quotation (RFQ) or Request for Proposal (RFP) that typically ensues after an RFI is issued. The contractors also possess a direct economic interest in the government action at issue in that they were both deprived of the opportunity to compete for the provision of acquisition and assistance solutions for JAAMS. The contractors allege that, as a result of the government's decision to forego the direct competitive process of procurement, they have collectively lost significant business opportunities amounting to approximately ten million dollars.

There is also no question that the contractors have alleged a number of statutory and regulatory violations by the government in choosing to forego the direct competitive procurement process and tasking SRA with the responsibility of selecting software vendors indirectly. These allegations include violations of the Competition in Contracting Act (CICA), 31 U.S.C. § 3551, *et seq*., the Small Business Act, 15 U.S.C. § 631(j)(3), and various Federal Acquisition Regulations (FAR). Though the government contests the merits of these allegations, it does not contend that any of these allegations are frivolous.

539 F.3d at 1344-45 (parenthetical supplied, citations and footnote omitted).

Plaintiffs contend that the agencies, having initiated a proposed procurement with a process for determining a need for the software products, were required to comply with procurement laws even as the acquisition morphed into subcontracts with task order contractor SRA. Secondly, in connection with RFI #2, plaintiffs conclude that the agencies evaluated proposals and made the decisions with SRA as an advisor and contracting proxy. For both reasons, it is asserted that the process and the ensuing acquisitions were required to comply with procurement laws and they did not.

Plaintiffs contend Infoterra is not licensed to do business in the United States and at that time did not have its software product in a production environment, a key criteria in both RFIs. Plaintiffs also contend that a member of the board of directors

of Compusearch was formerly an executive with SRA, creating or manifesting at minimum, a significant potential conflict of interest.

The subcontracts to Infoterra and Compusearch have expired.  Accordingly, plaintiffs seek only proposal preparation costs, citing *Klinge Corp. v. United States*, 86 Fed. Cl. 713, 720 (2009).[15/]  (Tr. Oral Arg. 18, 45, ECF No. 108.)

## III.  Discussion

### A.  Procurement protest jurisdiction

Proceedings pursuant to RCFC 52.1, which are limited to review of an AR, differ from those for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the AR.  *Bannum*, *Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005); *see* RCFC 52.1 Rules Committee Note (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record.").  The court determines whether the agencies complied with the legal standards governing the decision under review, and factual determinations are "as if [the court] were conducting a trial on the record."  *Bannum*, *Inc.*, 404 F.3d at 1357.

The United States Court of Federal Claims has jurisdiction pursuant to 28 U.S.C. § 1491(b)(1):

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

The phrase "procurement or proposed procurement" includes "all stages of the process of acquiring property or services, beginning with the process for determining

---

[15/] The opinion at 86 Fed. Cl. 713 was withdrawn upon denial of reconsideration and issuance of a superceding opinion at 87 Fed. Cl. 473 (2009); *see also L-3 Commc'ns Sys.,L.P. v. United States*, 79 Fed. Cl. 453 (2007) (indicating that facts, if proven, could warrant award of bid and proposal costs).

a need for property or services and ending with contract completion and closeout." *Distrib. Solutions*, 539 F.3d at 1345 (internal quotations marks and citations omitted). Specifically, "in connection with a procurement or a proposed procurement . . . involves a connection with any stage of the federal contracting acquisition process, including the process for determining a need for property or services." *Id*. at 1346 (internal quotation marks omitted).

## B.  Standards of review and prejudice

Pursuant to 28 U.S.C. § 1491(b)(4), the court reviews a challenged agency action in accordance with the standard set forth in section 10(e) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) – that is, whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (internal quotation omitted)). *See also PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009); *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004).

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983), delineated the factors to be considered in APA arbitrary and capricious or rational basis review:

> Normally, an agency [decision] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Adequate reasoning must be given. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id*. (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). *See Timken United States Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) ("[I]t is well

settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" (citing *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)).

As to the arbitrary or capricious standard, the "disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011). However, the court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000); *see BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677, 683-84 (2012) (articulating these standards). "'[T]he court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Weeks Marine, Inc.*, 575 F.3d at 1371 (quoting *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum, Inc.*, 404 F.3d at 1351.

As for allegations of failure to comply with procurement laws, "[w]hen a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

## 1. The parties' positions on prejudice

In this case prejudice was substantially addressed in response to an Order for supplemental briefing. Upon the filing of Supplemental Memorandums (ECF Nos. 118, 119) all briefing was completed and the matter is now ripe for resolution.

Plaintiffs insist that the Federal Circuit in *Distributed Solutions* determined they have standing and have shown requisite prejudice. "The Federal Circuit found that Plaintiffs were clearly prospective offerors, as they each submitted qualifying proposals, participated in the RFI process, and . . . 'were prepared to submit bids pursuant to the anticipated Request for Quotation (RFQ) or Request for Proposal (RFP) that typically ensues after an RFI is issued.'" (Pls.' Supp. Memo 5, ECF No.

119 (quoting 539 F.3d at 1345).)  Plaintiffs cite as relevant the Federal Circuit's comments:

> The contractors also possess a direct economic interest in the government action at issue in that they were both deprived of the opportunity to compete for the provision of acquisition and assistance solutions for JAAMS. The contractors allege that, as a result of the government's decision to forego the direct competitive process of procurement, they have collectively lost significant business opportunities amounting to approximately ten million dollars.

539 F.3d at 1345 (citation omitted).  This language, plaintiffs reason, answers and resolves the merits prejudice inquiries raised by the court.

Determination of the merits of a protest is an inquiry distinct from the jurisdictional determination. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353-54 (Fed. Cir. 2011); *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("A well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction."); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. at 695 n.28 (2010) (differentiating between initial examination of prejudice at pleading stage and determination of prejudice on the merits); *L-3 Comm'cns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 665 (2009) ("Whether L-3 will prevail on the merits of its disparate treatment argument is not a question of standing."). *See also Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81 (2011) (finding protestor had jurisdictional standing), and 101 Fed. Cl. 765, 790-91 (2011) (concluding protestor did not establish requisite prejudice for the merits of the protest).

Thus, while plaintiffs correctly observe that jurisdictional standing has been determined, that does not end inquiry.  Jurisdictional prejudice and standing are distinct from prejudice required for the merits. *Price v. Panetta*, No. 2011-1437, 2012 WL 881090 (Fed. Cir. Mar. 16, 2012) (differentiating between burden of establishing jurisdiction under the Little Tucker Act and jurisdiction on the merits); *see Science Applications Int'l Corp. v. United States*, 102 Fed. Cl. 644, 650-56

(2011); *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 693-97(2010) (noting some confusion).[16/]

To be clear, the existence of subject matter jurisdiction does not portend resolution of the merits of the protest, or preclude examination of the bona fides of improprieties alleged or plaintiffs' standing on the merits.   The Federal Circuit's direction in *Information Technology & Applications Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003), that prejudice for subject matter jurisdiction must be reached "before addressing the merits," presupposes distinct inquiries, otherwise the standing prejudice has no vitality. *Magnum Opus Tech., Inc. v. United States*, 94 Fed. Cl. 512, 530 (2010) (citing *Info. Tech.*, 316 F.3d at 1319); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002); *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1379 (Fed. Cir. 2009); *L-3 Comm'cns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 664 (2009); *Esterhill Boat Serv. Corp. v. United States*, 91 Fed. Cl. 483, 486 (2010); *Chenega Mgmt., LLC v. United States*, 96 Fed. Cl. 556, 571-72 (2010).

In what the parties acknowledge are unique facts (plaintiffs' counsel conceded that absent RFI #1, sustaining plaintiffs' protest would be difficult), plaintiffs focus

---

[16/]    This confusion has sometimes led the court to forego the prejudice inquiry altogether, in the belief that only "[i]f the court finds error" in the procurement process does "it then examine[ ] whether the error was prejudicial to plaintiff." *Info. Tech. and Applications Corp., Inc. v. United States*, 51 Fed. Cl. 340, 346 (Fed. Cl. 2001) (dismissing the protest after finding no errors in the contested procurement), *aff'd*, 316 F.3d 1312, 1319 (affirming dismissal of the protest on the merits, but holding that the Court of Federal Claims' "approach was erroneous" in failing to examine prejudice before addressing the merits). In other cases, the court has wasted judicial resources adjudicating the merits of a bid protest that the plaintiff never had standing to bring in the first instance. *E.g., Myers Investigative & Sec. Servs., Inc. v. United States*, 47 Fed. Cl. 605, 620 (2000) (holding that its "plaintiff failed to prove it was prejudiced by defendant's actions" and dismissing the protest, but only after deciding the merits), *aff'd*, 275 F.3d 1366, 1371 (affirming dismissal of the protest due to the plaintiff's failure to demonstrate prejudice, but on the ground that the plaintiff thus "did not have standing").

*Linc Gov't Servs., LLC v. United States,* 96 Fed. Cl. 672, 695 n.29 (2010).

on the agencies' decision to forego a proposed direct procurement of both types of software products and integration services.[17] While the task order for both types of software products and integration of the software was within the scope of SRA's IDIQ contract, the agencies were not compelled to task SRA with the software procurement, as would have been the case if the contract with SRA had been for the agencies' requirements. *Glenn Def. Marine (Asia), PTE, Ltd. v. United States*, 97 Fed. Cl. 568, 579 n.19 (2011).

On the merits, plaintiffs contend that the agencies were obligated to comply with all federal procurement laws and regulations in "connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services,'" *Distributed Solutions*, 539 F.3d at 1346 (quoting 28 U.S.C. § 1491(b)(1) and 41 U.S.C. § 403(2)), and the decision to forego a proposed direct procurement in favor of a task order to its IDIQ contractor was done without consideration of several constraints mandated by federal procurement law and regulations – including the Competition in Contracting Act (CICA), and was not adequately supported.

Preliminarily, however, regardless of the bonafides of the various procurement law irregularities advanced, a nexus between any deficiency and particularized harm to these plaintiffs is required. Plaintiffs must not only demonstrate a violation of procurement law or regulation, but that the error prejudiced them. *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). If arbitrary action exists or adequate reasoning is found to be lacking, the court also must determine if prejudice resulted. *Bannum, Inc.,* 404 F.3d at 1351-54. Lack of focus on this fundamental issue in part led to the court's request for supplemental briefing which revealed a divergence in the prejudice the parties believed would serve to cross this threshold.

Defendant points out that absent a prejudice requirement, protestors would essentially serve as private attorney generals which is neither what Congress intended

---

[17] "[Plaintiffs] are contesting the government's decision to task SRA with awarding subcontracts for the purchase of software instead of procuring the software itself through a direct competitive process." 539 F.3d at 1343-44. "[Plaintiffs] are challenging the government's decision to pursue an alternative course of action by inserting SRA into the process instead of directly procuring from the process." *Id.* at 1344 (internal quotation marks omitted).

nor precedent demands.  Defendant contends plaintiffs must establish that but for
USAID's decision to task SRA with integration and acquisition of both types of
software products they had a substantial chance of a contract award, and because
neither DSI nor STR were among the most highly rated offerors in either RFI, they
cannot meet that standard.  (Def.'s Supp. Mem. 15, ECF No. 118.)  The substantial
chance prejudice standard is generally referred to as a post-award standard, *see
discussion infra*.[18/]

The appropriate inquiry according to plaintiffs is whether they have
demonstrated a "'non-trivial competitive injury which can be addressed by judicial
relief.'"  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009)
(concluding this standard applies to a pre-award bid protest asserting "'any alleged
violation of statute or regulation in connection with . . . a proposed procurement.'"
(adopting the standard in *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748,
756 (1998)); *see also Google, Inc. v. United States*, 95 Fed. Cl. 661, 673 (2011) ("'it
is sufficient for standing purposes if the plaintiff shows that it likely would have
competed for the contract had the government publicly invited bids or requested
proposals.'"); *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 530-31
(2010).

Plaintiffs conclude they were bona-fide suppliers of software products
contemplated for direct procurement, were prepared to respond to an RFP, and were
deprived of the opportunity to compete in a direct federal procurement by the
agencies' decision to "bundle" the two software products and include them in a task
order to SRA.  Then if the proposed procurement path failed to follow statute or
regulation, plaintiffs have been wrongfully deprived of the opportunity to fully and
fairly compete, which suffices to establish prejudice as a "'non-trivial competitive
injury which can be addressed by judicial relief.'"  *Weeks Marine*, *Inc. v. United
States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009).  "[T]he loss of an opportunity to
compete fully and fairly for a federal procurement opportunity is recognized as just
the sort of 'non-trivial competitive injury' to satisfy the jurisdictional standing
requirements."  (Pls.' Supp. Mem. 4, ECF No. 119 (footnote omitted).)

---

[18/] Defendant observes that when this case was filed, the Nature of Suit Code for a post-award
protest was selected.  No authority is cited that under the circumstances presented here, plaintiffs
should be bound to a "check-off-the-box" filing categorization, made years before the current refined
analysis.  Defendant does not contend it relied on that designation except in making this argument.
The court will not hold plaintiffs to their administrative filing selection.

Responding to the defendant's position that post-award analysis should apply, requiring plaintiffs to establish they had a substantial chance of a contract award, plaintiffs reason that RFI #1 did not result in a contract award; the agencies did not award any contracts; the task order awarded to SRA pre-dated the events here, and the Federal Circuit excluded examination of SRA's procurement from this court's jurisdiction. Accordingly, as there is no contract award over which this court has jurisdiction, post-award analysis would be incongruous.

## 2.  The court's resolution of injury requirements

In *Weeks Marine* the Federal Circuit adopted the pre-award merits standard of "non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine*, 575 F.3d at 1363 (approving the standard articulated in *WinStar Communications, Inc. v. United States*, 41 Fed. Cl. 748 (1998)). Where, as in the circumstances presented, error in connection with a proposed procurement is alleged, "there is no factual foundation for a 'but for' prejudice analysis"– the court cannot, therefore, assess whether "but for" the error alleged, plaintiffs had a substantial chance of receiving a contract award. *Weeks Marine*, 575 F.3d at 1361. There is no meaningful way to assess prejudice if the failure to hold a direct competition was wrongful or not adequately supported. Plaintiffs were wrongfully deprived of the opportunity to fully and fairly compete, which suffices to establish prejudice on the merits.

Under the circumstances presented, it is concluded that the standard to be applied is a non-trivial competitive injury. *Weeks Marine, Inc.*, 575 F.3d at 1362 (holding this standard applies to a protest alleging "any alleged violation of statute or regulation in connection with . . . a proposed procurement" (quoting 28 U.S.C. § 1491(b)(1)); *see also Google, Inc. v. United States*, 95 Fed. Cl. 661, 673 (2011) ("'[I]t is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals.'" (citing *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997)); *Magnum Opus*, 94 Fed. Cl. at 530-31.[19] The Federal Circuit's assessment of whether that standard was met in *Weeks Marine* has relevance here:

---

[19] Noting a "lack of unanimity,"application of the non-trivial competitive injury standard articulated in *Weeks Marine* was recently analyzed in *Orion Technology, Inc. v. United States*, 102 Fed. Cl. 218, 227 (2011), *appeal docketed*, No. 2012-5062 (Fed. Cir. Feb. 2, 2012).

This is not a pre-award case where the alleged violation is "immaterial" and will not have an impact on Weeks's economic situation. *See CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988) (discussing prejudice in the pre-award context). Rather, Weeks has a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations. If the MATOC solicitation is allowed to go forward, it will dictate Weeks's bidding and government work in the South Atlantic Division for the next five years. In sum, Weeks is an interested party who has demonstrated the requisite degree of prejudice for standing.  We therefore hold that it has established standing.

*Id*. at 1362.

Similarly, in *Distributed Solutions*, the Federal Circuit found that plaintiffs were clearly prospective offerors, as they each submitted qualifying proposals, participated in the RFI process, and "were prepared to submit bids pursuant to the anticipated Request for Quotation (RFQ) or Request for Proposal (RFP) that typically ensues after an RFI is issued."  539 F.3d at 1345.  As to the more pertinent issue of prejudice in the present context, the Federal Circuit stated:

The contractors also possess a direct economic interest in the government action at issue in that they were both deprived of the opportunity to compete for the provision of acquisition and assistance solutions for JAAMS.  The contractors allege that, as a result of the government's decision to forego the direct competitive process of procurement, they have collectively lost significant business opportunities amounting to approximately ten million dollars.

*Id*.

In addition to the elimination of an opportunity to compete in a direct procurement, *Weeks Marine* also instructs that a reduced right to compete is sufficient injury.  The Federal Circuit there reasoned that despite the alleged procurement law violations, Weeks was likely to win an award, just not one as substantial as it could have absent the procurement violations.  Analogously, while plaintiffs here competed for a private subcontract, it was different not only because it was a private not a

-19-

government procurement (the latter having recourse rights and the like addressed herein), but also integration was excluded.  The removal from direct government procurement removes at minimum the jurisdiction and remedies of this court and also deprives plaintiffs of the experience of holding a prime government contract.

While disagreeing with the standard, defendant's response to claims of non-trivial competitive injury is that neither plaintiff suffered any prejudice; they were not deprived of an opportunity to compete because SRA used the same procedures and followed the same federal procurement laws that USAID would have used in a direct procurement.[20]

Plaintiffs reply that defendant's response proves plaintiffs' point.  When addressing jurisdiction, defendant concedes that SRA's conduct cannot be considered in determining this court's procurement protest jurisdiction which extends only to acts or omissions of the contracting agencies, not those of a private party contractor such as SRA.  The Federal Circuit made it very clear that SRA's subcontract solicitation and awards are not subject to this court's jurisdiction.  A direct procurement would have been subject to this court's procurement protest jurisdiction; SRA's subcontracting was not.  Defendant's position fails to recognize the prejudice which results from the absence of any remedy to obtain compliance with federal procurement standards.

Accordingly, even if the existence of competition in SRA's subcontracting is given credence, the absence of protest remedies available in government procurements results in diminished competitive opportunities sufficient to constitute

---

[20]     The [AR] does not show that the CICA competition that Plaintiffs seek would have been any different if USAID had procured the software directly with the advice of an integrator. The record shows SRA followed the principles of FAR Subpart 15.3, conducting a competitive procurement in which Infoterra and Compusearch were determined to be the best value to the Government over the other vendors.

(ECF No. 118 at 29.)

It is not clear what remedies, if any, plaintiffs would have had for any breach of the contract between SRA and the agency which required that the subcontract award process comply with federal procurement law.

non-trivial competitive injury as in *Weeks Marine*. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 n.1 (Fed. Cir. 2006) (stating that a protestor may have standing if "improper agency action" prevented the submission of a bid **or** a protest of the solicitation); *ICP Nw v. United States*, 98 Fed. Cl. 29 (2011) (concluding that the Forest Service's deviation from Blanket Purchase Agreements to Agency Cooperators diminished competitive options, satisfying prejudice requirement); *Google, Inc. v. United States*, 95 Fed. Cl. 661, 674 (2011) ("'[D]eprivation of an opportunity to compete is sufficient economic harm to demonstrate prejudice for purposes of standing.'" (citing *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 533 (2010)).

## C. **The merits of the protest**

### 1. **Arbitrary or capricious or lacking underlying rationale**

It is not contended that following review of vendor responses to RFI #1 the agencies' decision that vendors lacked sufficient experience or expertise to integrate and then assigning the task to SRA, was arbitrary, capricious, or was not supported by sufficient rationale. While plaintiffs do not contest the conclusion that an existing prime integrator should be used, the parties do not direct the court to any reasoning why SRA should procure the software products. "After reviewing responses to the RFI, USAID determined that, as the integrator, SRA should take the lead role in evaluating and procuring the appropriate COTS product." (AR 175.) Not only is this conclusion lacking in specifics, it is also a statement by SRA, not defendant. The absence of any rationale for assigning the procurement of the software products to SRA is a separate basis for protest.

Plaintiffs, both small businesses, complained that the agencies combined two separate proposed direct software procurements and tasked them to SRA without rationale (or at least defendant does not point to any rationale for that part of the procurement path). (Pls.' Mem. Supp. Mot. J. AR 6, ECF No. 78.) "Moreover, STR's grants management software and DSI's acquisition assistance software could have been provided by each vendor separately, with each vendor providing their own integration services." (Compl. ¶ 24.) Plaintiffs comment that "the Government has consistently issued an RFQ to procure software after receiving input from its lead system integrator, which would avoid this very problem." (*Id.* ¶ 33.) Relief requested included "a declaration and order that the selection of grants management software

and the selection of acquisition assistance software must each be the result of a separate competitive bidding process." (*Id.* ¶ 26.)

In this regard, while SRA acted in an advisory role in selecting the software, plaintiffs no longer contend SRA's procurement was on behalf of the government within the parameters of *Johnson Controls*.  However, SRA's advisory capacity in that selection highlights the need for reasoning, and, in the circumstances presented, the need for a rationale why the agencies could not have proceeded with direct procurements of the software products.

The agencies considered acquiring the software products directly even after RFI #1 (dated June 27, 2005) and before RFI #2 (August 12, 2005).  In a draft "Acquisition Strategy," dated July 25, 2005, the agencies planned two "near-term acquistions:" (1) an RFQ for the software products; and (2) a modified or new task order to SRA for its "new JAAMS role." (AR 1090.)  Also, in their draft "Analysis of Alternatives," dated July 23, 2005, an RFP to software vendors was a possible alternative.  (AR 1097, 1099).  The software products were "commercial-off-the-shelf," not requiring any special modification except for the integration services separately being supplied by SRA – ready to use out of the box.  (AR 1061.)

Notwithstanding the foregoing, reasoning for foregoing a direct procurement of the COTS software products is lacking.  "[T]he contracting agency [must] provide[] a coherent and reasonable explanation of its exercise of discretion." *Impresa Construzioni*, 238 F.3d at 1333 (internal quotations and citation omitted).  The court's role in a bid protest, including ascertaining the existence of a rational basis, is not to substitute judgment for the agency; indeed, the agency generally is accorded wide discretion in evaluating bids.  *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed. Cir. 1994); *see also Camp v. Pitts*, 411 U.S. 138, 142–43 (1973) (stating that courts should review facts to determine if agency's decision is supported by rational basis).

However, the court must determine if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance. Co*., 463 U.S. 29, 43 (1983), but "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Ark-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).  The court may, however, "uphold a decision of less than

ideal clarity if the agency's path may reasonably be discerned." *Id*. at 286 (citation omitted). The standard is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). For example, if the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or made a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Beginning to assess the parameters of a government need, while within the definition of a proposed procurement, does not cement a path to a competitive procurement. But, as the Federal Circuit directed in *Distributed Solutions*, federal procurement constraints apply to decisions in connection therewith.

Defendant's myopic focus on the agencies' articulation that vendors surveyed via RFI #1 lacked sufficient integration experience therefore SRA would provide those services, bypasses the heart of plaintiffs' protest, as honed, which is not over the decision to have SRA integrate software products, but rather the lack of rationale for removing the procurement of software products from direct procurement and from combining two types where separate responses were originally solicited. Just because a prime integrator was needed does not automatically mean that the government can't directly and separately, procure the software products. The selection by USAID and DoS of the software products following RFI #2 with the assistance of SRA, which SRA then acquired, illustrates that there was no impediment to a direct procurement, or at least defendant does not point to any agency rationale therefore.

Plaintiffs have established that the agencies, having commenced a proposed procurement in assessing their needs, failed to adequately support the deviation from the proposed direct procurement, which resulted in non-trivial competitive injury to plaintiffs.

## 2. Violation of procurement law

Another ground for sustaining a protest is a showing that "the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni*, 238 F.3d at 1332. This requires a "clear and prejudicial violation of applicable

statutes or regulations." *Id*. at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

### a.  Competition in Contracting Act (CICA)

During relevant times the CICA required:

(a) Procurement through full and open competition; competitive procedures

> (1) Except as provided in subsections (b), (c), and (g) of this section and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for property or services –
>> (A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this title and the Federal Acquisition Regulation; and
>> (B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

41 U.S.C. § 253(a)(1) (now codified at 41 U.S.C. § 3301(a).) *See also* FAR § 6.101.

Plaintiffs assert that the CICA required the procurement of the software products using full and open competition absent one of several statutory exceptions. The lack of any CICA analysis, or justification why such was not necessary, prejudiced plaintiffs, depriving them of not only the opportunity to compete fully and fairly for the software products, but also of the protections of the federal procurement system's protest procedures, which at minimum resulted in non-trivial diminished competitive rights.

Defendant responds that SRA used competitive processes and plaintiffs' participation in SRA's competitive software procurement demonstrates they did not suffer any prejudice, and alternatively, SRA's competitive procedures cured any competitive harm plaintiffs may have suffered. (Def.'s Supp. Mem. 5, ECF No. 118.)

The court's prior analysis rejecting defendant's reliance on competition in SRA's subcontracting as equivalent to direct government procurement is applicable here as well.

Defendant also argues that plaintiffs erroneously rely on internal agency documents for their position that a direct procurement was intended, and on *Weeks Marine, Inc. v. United States*, 79 Fed. Cl. 22 (2007), for their legal position, a case subsequently reversed in relevant part. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352 (Fed. Cir. 2009).[21] The government would limit inquiry to publicly-distributed material. In this regard, however, defendant does not cite authority that a bid protest based on a violation of federal procurement law is limited to documents publicly disseminated. Indeed, the compiling and filing of the AR by the relevant agencies for subsequent scrutiny for procurement law violations or arbitrary or capricious review, is the norm. RCFC App. C, ¶¶ 21-24. Nevertheless, plaintiffs do not now seriously contend that the agencies were required to ripen RFI #1 into a direct procurement, only that procurement laws must be observed in deviating from that direct path proposed in the manner that transpired here, which is the appropriate inquiry. *Distrib. Solutions*, 539 F.3d at 1346.

Plaintiffs cite sole-source cases, not because the acquistions were sole-source, but as examples of change in procurement method requiring documented justification for deviation from full and complete competition, an analytical framework for the court's inquiry here. *Savantage Financial Services., Inc. v. United States*, 81 Fed. Cl. 300 (2008) concluded "that a change in a procurement process that results in a non-competitive award must be justified." (Pls.' Mot. J. AR 5, ECF No. 77.) There the government asserted the agency made a rational decision to standardize its software

---

[21] Addressing *Weeks Marine*, plaintiffs cite the Court of Federal Claims' decision in support of their position that lack of explanation for change in procurement method in the AR warrants a conclusion that justification therefore is lacking; therefore, plaintiffs' protest must be sustained. (Pls.' Mem. Supp. Mot. J. AR 28, 33, 35; ECF No. 78.) Defendant's criticism of that citation as being overruled in part is correct in that the decision was reversed in part. The protestor alleged violations of CICA requirements for sealed bidding unless non-price-related factors were pertinent. The solicitation provided that non-price-related factors were relevant and how those factors would be evaluated and the protestor at oral argument admitted that price was not the sole determinant, therefore, the question remaining was whether the record evidenced a rational basis for the procurement decision. The Federal Circuit concluded the record reflected a rational basis and reversed on that ground.

systems to a particular brand.  The protestor asserted the agency failed to justify the sole-source exception to CICA.[22/]  The court agreed, finding the agency did not properly invoke the sole-source exception to full and open competition and enjoined the solicitation.  Subsequently, the agency issued a new solicitation.  It too was protested.  The court found no procurement law violation in the revised solicitation which eliminated the prior brand name limitation and specified a pre-integrated system.  The decision was affirmed on appeal, a result and holding that does not deny the efficacy of the initial *Savantage* decision.  *Savantage Fin. Serv., Inc. v. United States*, 86 Fed. Cl. 700 (2009), *aff'd*, 595 F.3d 1282 (Fed. Cir. 2010).

The initial *Savantage* decision cited *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 789 (1997) as "remarkably similar" to the facts there presented.  81 Fed. Cl. at 305.  In *CCL*, upon expiration of the protestor's information technology (IT) contract, the DoD expanded the scope of its contract with another IT provider to encompass work previously performed by the protestor.  The court concluded that the modification, which exceeded the scope of the original contract, was made "without either the necessary competition or findings excusing competition."

> Contract modifications may not materially depart from the scope of the original procurement; otherwise the modification prevents the complaining party (and other potential bidders) from competing for what is, in reality, a new and different contract.

39 Fed. Cl. at 791 (citing *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 781-82 (1997)).  The *Savantage* court reasoned that in both instances, the government was "'procuring goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is in violation of law.'"  *Savantage*, 81 Fed. Cl. at 304 (citing *CCL*, 39 Fed. Cl. at 789)).

*CCL* was also cited in *Distributed Solutions*, 539 F.3d at 1345 n.1 as "finding jurisdiction based upon the plaintiff's allegation that the government violated CICA

---

[22/] The sole-source exception "permits an agency to forego full and open competition when 'the property or services needed by the executive agency are available from only one responsible source and no other type of property or services will satisfy the needs of the executive agency.'" *Savantage*, 81 Fed. Cl. at 306-07 (citing 41 U.S.C. § 253(c)(1)).  Invocation of that exception has several requirements that were found lacking.  *Id.*  The court also recognized other statutory exceptions discussed herein.

while separately analyzing whether CICA was, in fact, violated." Expansion of an awarded contract can require competitive considerations and be subject to this court's protest jurisdiction as part of a procurement continuum of "in connection with a procurement or a proposed procurement." *See AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). "CICA . . . does not prevent modification of a contract by requiring a new bid procedure for every change. Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement." *Id*. at 1205 (footnote omitted).

The CICA requires full and open competition absent one of "'several relatively narrow exceptions,'" 81 Fed. Cl. at 306 (quoting *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 19 (D.D.C. 2001)), including the sole-source exception contested in *Savantage*,[23/] and then only if the requirements for invoking that exception have been met. Also, the Federal Acquisition Streamlining Act of 1994 (FASA) until recently, insulated task orders under IDIQ contracts from CICA, unless the order increased the scope, period, or maximum value of the underlying contract, or was in excess of ten million dollars, "so long as 'the task or delivery order contract itself has been obtained through full and open competition.'" *Id*. at 307 (citing 41 U.S.C. § 253j(d)). *See DataMill, Inc. v. United States*, 91 Fed. Cl. 740 (2010) (dismissing for lack of subject matter jurisdiction post-award claim that government violated CICA in issuance of delivery or task order, citing FASA). Here, plaintiffs do not assert the software acquisitions by SRA were beyond the scope of its Millenium contract, which was awarded following full competition.[24/]

The court in *Savantage* disagreed with the government's reliance on FASA to exempt the agency from competition requirements, characterizing the protest as over

---

[23/] A sole-source procurement is not valid if products and services are available from several sources and on the open market. *Savantage*, 81 Fed. Cl. at 306-07. The sole-source exception to full and open competition is provided by Section 253(c)(1) which provides that "[a]n executive agency may use procedures other than competitive procedures only when – (1) the property or services needed by the executive agency are available from only one responsible source and no other type of property or services will satisfy the needs of the executive agency." 41 U.S.C. § 235(c)(1). Substantively similar provisions are in 10 U.S.C. § 2304.

[24/] While plaintiffs note that it is not clear just how SRA was given the "task" of procuring the software and providing integration, the government cites to a November 6, 2003 task order. (AR 178-91.) Regardless, the parties do not disagree that SRA's subsequent subcontract awards were within the scope of its Millenium contract.

the decision to migrate to one brand of software, not the subsequent task order to assist in the actual migration to the chosen brand.  In granting a subsequent EAJA fee application, finding the government's FASA position was not substantially justified, the court reaffirmed that the protest was over the sole-source procurement of software, not the subsequent task order for services to assist with the migration to that software; accordingly, FASA did not apply.  *Savantage*, 2008 WL 4443095, at *5-6 (Fed. Cl. Sept. 29, 2008).  The situation at bar is similar in that the protest is over the deviation from a direct procurement, not SRA's subcontract awards.

Plaintiffs cite *Blue Dot Energy Co. v. United States*, 76 Fed. Cl. 783 (2004), *rev'd,* 179 F. App'x 40 (Fed. Cir. 2006).  In *Blue Dot*, the Air Force cancelled a solid waste management services solicitation initially set aside for companies located within historically underutilized business zones (HUBZone) and issued a sole-source award.  *Id*. at 785-88.  The Air Force determined that the service provider must possess a state certification prior to performance, and there was only one provider with an existing state certification; therefore, only one responsible source, justified according to the agency, the sole-source exception.  On the merits of the post-award protest, the agency's determination that a state certification was required was concluded to lack a rational basis.  Accordingly, there was more than one responsible source, rendering that exception to full and open competition inapt.  The sole-source award was enjoined.  *Id.* at 808-10 (citing 10 U.S.C. § 2304(a)(1)(A)).[25]  The Federal Circuit in an unpublished decision,[26] reversed, finding the Air Force acted within its discretion to determine responsible bidders must have a current state solid waste disposal certificate.  There being only one, the sole-source exception to 10 U.S.C. § 2304(c)(1) was applicable, a result that does not undermine the underlying premise that decisions to deviate from a direct procurement are subject to CICA.  *See also Cal. Indus. Facilities Res., Inc. v. United States*, 100 Fed. Cl. 404, 407 (2011)

_____

[25] 10 U.S.C. § 2304 is substantively similar to 41 U.S.C. § 253, both mandating competition in contracting.  The former generally constrains the Secretaries of Defense, Army, Navy, Air Force, Homeland Security and the Administrator of the National Aeronautics and Space Administration, the latter statute, other executive agencies.  10 U.S.C. § 2302(1); 41 U.S.C. § 252(a).

[26] *Blue Dot Energy Co. v. United States*, 179 F. App'x. 40, 46 (Fed. Cir. 2006) (unpublished).  While citation to nonprecedential dispositions prior to January 1, 2007, is prohibited, the decision is not cited here as precedent.  *See* Fed. Cir. R. 32.1(d) ("The court may refer to a nonprecedential disposition in an opinion or order and may look to a nonprecedential disposition for guidance or persuasive reasoning, but will not give one of its own nonprecedential dispositions the effect of binding precedent.").

(rejecting conclusions by the agency of "urgent and compelling need," another exception to CICA, finding the award violated CICA); *RN Expertise, Inc. v. United States*, 97 Fed. Cl. 460, 473-74 (2011); *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 106-10 (2004).

In *RN Expertise*, the presumptive awardee of the Navy's solicitation[27] for urine collection services for drug testing challenged the cancellation/change of a direct procurement and addition of the services to an interagency agreement with the Department of the Interior (DOI). The DOI's contract with a private company was modified to add on-site collections. In its decision to cancel, the Navy cited efficiencies with a 28% cost saving in the first year and FAR Clause 52.212-1(g) which allows for the rejection of all offers if in the public interest. Granting the government's motion for judgment on the administrative record, the court concluded that "the [p]laintiff fail[ed] to demonstrate that the Navy's decision to cancel the solicitation was arbitrary, capricious, or in violation of procurement law." 97 Fed. Cl. at 476. Plaintiffs contend that in contrast, by application of the same inquiry and analysis, the record here demonstrates failure to comply with procurement law and regulation. *See Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 314-18 (2010) (exercising jurisdiction over a protest of an agency's pre-award determination to voluntarily undertake corrective action, concluding on the merits that the corrective action was not irrational but rather remedied lack of meaningful discussions in the initial procurement).

Similarly, in *Cygnus Corp. v. United States*, 72 Fed. Cl. 380 (2006), the protestor, an incumbent, responded to a RFP. The protestor and another were found to be within the competitive range. To save costs, the agency cancelled the procurement, having determined the services could be obtained through a blanket purchase agreement. Analyzing prejudice, the court concluded the protestor had a substantial chance to have received the contract, as the incumbent and one of the two considered within the competitive range. Citing *Impresa Construzioni*, 238 F.3d at 1333; *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) and *Baird Corp. v. United States*, 1 Cl. Ct. 662, 664 (1983), the court concluded that the

---

[27] Citing *Distributed Solutions*, the court had previously affirmed jurisdiction, concluding "[t]here is no question that the Navy was in the midst of a procurement at the time it cancelled the solicitation for which RN claims it would have been awarded a contract." *RN Expertise, Inc. v. United States*, No. 09-673, 2010 WL 2674536, at *2 (Fed. Cl. June 25, 2010).

agency's rationale of cost savings, given as a reason for the cancellation, did not find support in the record. Nevertheless, the court concluded that the cancellation was supported by the second rationale – that the work being procured was available under another contract vehicle. Finding that although there were some errors in agency analysis and conclusions as to scope of existing contract vehicles, it was not so excessive as to fall outside agency discretion, nor render the decision arbitrary or capricious. Asserted Small Business Act and CICA violations were considered to be premature as the Blanket Purchase Agreements – the alternative contract vehicle – had not then been utilized. The Federal Circuit affirmed per curiam. 227 F. App'x 909 (Fed. Cir. 2007).

In *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731 (2007), the solicitation was originally a small business set-aside (another exception to full and open competition) because there were two small businesses that manufactured a particular knife to be procured. Subsequently, one of those providers went out of business, leaving only one source. The original solicitation was cancelled and a new unrestricted competitive solicitation issued. The decision to cancel the original solicitation was concluded not to be arbitrary or capricious, and did not violate small business, bundling, statutory or regulatory restrictions. The rationale for the small business set aside, two or more qualified small business potential offerors no longer in play, the change in procurement method was not only rational and adequately supported by the record, it was required.

It is defendant's position, however, that its transition from RFI #1 had nothing to do with competition or lack thereof, but was a rational decision that the vendors responding to RFI #1 lacked experience to integrate the worldwide JAAMS program, a reasoned conclusion that plaintiffs do not assail as either arbitrary or capricious or lacking a rational basis. Nor do plaintiffs seriously contend that the agencies were not free to issue a task order or that the issuance of the task order itself violated any procurement laws. As USAID reasonably determined that a prime integrator was needed,[28] it is argued that inquiry is over and plaintiffs' protest fails on the merits. Claims that competition was not considered does not change that conclusion because to do so would have competitive requirements precede or trump other rational agency

---

[28] In this regard, at oral argument plaintiffs' counsel described the software products as the core of the JAAMS initiative and the integrator was akin to a construction manager. (Tr. Oral Arg. 8, ECF No. 108.)

decision-making, defendant concludes. While there are circumscribed exceptions to CICA such as sole-source, small business set-aside and the like, no authority is cited that would sanction failure to comply with the requirement for fair and open competition for direct procurements.

In reply to defendant's contention that the agency decision to use SRA to integrate was a rational decision that nullified any competition requirement, plaintiffs assert that only self-serving documents by agency representatives submitted during the GAO proceedings support that position. (Plfs.' Reply Mot. Dismiss 18; ECF No. 88.) This is not correct. Defendant's Motion to Dismiss cites AR 1116 (Def.'s Mot. Dismiss *passim*, ECF No. 79) which is an Action Memorandum Requesting Approval to Implement JAAMS/PSIP approved on August 12, 2005 by DoS and on September 15, 2005 by USAID. DSI's protest was filed on November 18, 2005 (AR 243-58); STR's GAO protest was filed on October 13, 2005 (AR 1-118). Included in defendant's GAO Request for Dismissal dated December 27, 2005, is the Declaration of Linh Lam, Program Analyst for USAID and manager of the JAAMS program (AR 261-65) which contains similar conclusions:

> The results of [RFI #1] helped determine whether discrete or a combined acquisition and assistance solution(s) should be procured. It also helped determine the path forward for USAID and DoS in defining the implementation strategy which resulted in splitting the program into two projects. The result of which was for USAID and State to implement the same Assistance solution (JAMS), while USAID will implement a separate Acquisition solution from DoS, (PSIP).

> It was also determined that, based on the complex business and technical environment, SRA, the current Prime 2.2 systems integrator, would be used to integrate the four primary Acquisition and Assistance functions which includes Grants administration, and eCatalog, Simplified Purchases, and Large Contracts Management functions as part of Procurement administration. The systems integrator was tasked to obtain software for these functions from vendors that could respond to one or multiple functions.

(AR 263 (Lam Declaration).) This document is cited by defendant. (Mot. Dismiss at 5; ECF No. 79.)

In two recent opinions, government in-sourcing decisions were examined as to whether the justification not to procure directly was arbitrary or capricious or failed to comply with procurement laws. In *Santa Barbara Applied Research, Inc. v. United States*, 98 Fed. Cl. 536 (2011), the Department of the Air Force in-sourced work previously performed by the protestor. Jurisdiction was well-grounded as the in-sourcing decision was made "in connection with a procurement" and the protestor, a likely competitor was an "interested party" under the Tucker Act. Following legislation and guidelines requiring greater use of civilian employees, and budgetary realignment that decreased funding for private contracts, the Air Force, in complying, identified work that could be in-sourced, and possible cost savings therefrom, which included work previously performed by the protestor. The protestor filed suit over the in-sourcing plan. The Air Force voluntarily agreed to reevaluate, discovering data and computation errors, but upon reevaluation, came to the same result. On the merits of the protest, it was concluded that the Air Force complied with statutory and regulatory requirements and its expectation of cost savings of $8.8 million by insourcing was neither arbitrary nor capricious. Accordingly, the government's motion for judgment on the administrative record was granted.

*Hallmark-Phoenix 3, LLC v. United States*, 99 Fed. Cl. 65 (2011) was a protest of the Air Force's decision for budgetary reasons to use civilian employees to provide services previously provided under contract to Hallmark. The court concluded these circumstances did not confer jurisdiction in this court, and the protestor lacked prudential standing,[29] respectfully disagreeing with *Santa Barbara*'s conclusion that "once a party satisfie[d] the more stringent 'interested party' test, standing is established." 99 Fed. Cl. at 69. Questioning the protestor's prudential standing, the court concluded "the injury of which plaintiff complains does not arguably fall within the zone of interests sought to be protected by these statutes [referring to the cost mandates]. Rather . . . all of the provisions plaintiff invokes in seeking to overturn the Defense Department's in-sourcing decision envision enforcement not by judicial review, but by legislative oversight." *Id.* at 72.

Defendant here does not cite any statutory or regulatory reasons for the decision to deviate from direct procurement. Neither party directed the court to

---

[29] Finding it debatable whether the protestor was a prospective bidder within the meaning of "interested party" in 28 U.S.C. § 1491(b)(1), the court declined to resolve that issue, finding the lack of prudential standing sufficient to deny subject matter jurisdiction.

record consideration of any impact on competition, or justification for using other than approved contracting methods, the agencies apparently believing that no such thought was required. It is assumed that the absence of any record evidence of agency analysis whether tasking SRA to procure the software would impact competition as mandated by CICA establishes that no such analysis was conducted. The question remains whether this error created a non-trivial competitive injury. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009). In this regard, the procedure established for selecting the software provider under the SRA task order provided a competitive process but not one constrained by federal procurement laws. In these circumstances, for the reasons delineated earlier, while assigning the integration work to SRA was justified, it is concluded that the agencies' failure to consider competitive ramifications resulted in unsupported decisions to task SRA with the additional function of acquiring both software products to be integrated and thus failed to comply with CICA, resulting in a non-trivial competitive injury to plaintiffs who were clearly interested parties in the direct procurement originally contemplated.[30]

## b. Organizational Conflict of Interest (OCI)

The decision to forego a direct procurement and funnel the procurement of software products to SRA was not only made without analysis of impact on competition, but also failed to consider what plaintiffs describe as potentially serious conflicts of interest, that is SRA had an inherent incentive to select (or recommend) software products that required more of the integration services SRA was tasked to provide.

_____

[30] Neither plaintiffs nor defendant contends that the acquisition of COTS software products was exempt from CICA. *See generally* 48 C.F.R. Part 12.

Plaintiffs also claim regulatory violation in that the deviation from a proposed direct procurement contravened FAR § 6.101 which provides that government "[p]olicy" is "10 U.S.C. 2304 and 41 U.S.C. 253 [which] require, with certain limited exceptions (see subparts 6.2 and 6.3), that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contracts." FAR § 6.101(a). These exceptions include the sole-source/only one responsible source discussed *infra*. Detailed justification requirements for other than full and open competition are contained in FAR §§ 6.303-1 and 6.303-2 (referred to as justification and approval – J&A). Plaintiffs also point out that the agencies failed to use approved procurement procedures in FAR § 6.102, with deviation permitted with a properly executed determination and finding ("D&F"). Defendant does not contend this procedure was followed, and does not point to any D&F in the record.

SRA participated in drafting both RFIs.  (AR 170, 175, 263, 292.)  Following RFI #2, SRA at minimum advised and recommended in the selection process and then purchased (on defendant's behalf according to plaintiffs) software products that required more integration.  Being paid assertedly on a time and material basis for integration services, SRA would have an economic incentive to select software products that required more integration.  And there is evidence that degrees of integration were considered.  The Source Selection Memorandum dated October 31, 2005 (following RFI #2), lists weaknesses of Compusearch's PRISM program (recommended by SRA), concluding "[t]he most significant risks associated with Compusearch PRISM are related to integration with the USAID financial management system."  (AR 746.)  Conversely, a disadvantage of plaintiff DSI's acquisition software package was that configuration and maintenance would be performed by the vendor.  (AR 755.)

Defendant characterizes plaintiffs' challenge here as contesting conflicts in the selection of the two subcontractors, and cites to plaintiffs' filings alleging exactly that. (Pls.' Mem. Supp. Mot. J. AR 18-19, ECF No. 78 (alleging impaired objectivity caused flawed product selection in the subcontract award to Infoterra for a product that was not fully deployed elsewhere in the government and in the subcontract award to Compusearch "because a member of Compusearch's Board of Directors is a former executive with SRA").)   The court, however, has no jurisdiction over SRA's subcontract awards.  *Distrib. Solutions,* 539 F.3d at 1346 ("The trial court was certainly correct that adding work to an existing contract that is clearly within the scope of the contract does not raise a viable protest under § 1491(b)(1).")

Plaintiffs also assert that an OCI analysis was required before the delegation to SRA, a stage in the procurement over which jurisdiction is established.  Defendant contends, however, that at this step in connection with a procurement, "[n]o law or regulation required USAID to either conduct an OCI analysis at such an early stage of a procurement [at] the prime/subcontractor level of contracting."  (ECF No. 79 at 13.)  Defendant adds that no conflicts could have been identified then until responses were received from RFI #2.

"'[T]he identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion.'" *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1384 (Fed. Cir. 2011) (citing *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009)).  There are two

inquiries under FAR § 9.504(a) – "the duty to evaluate potential OCIs as early as possible and the duty to mitigate *significant* potential OCIs before contract award." *Id*. at 1386 (emphasis in original). Evaluation of potential conflicts need not be made in every instance and does not have to be made prior to an award. *Id*. "Hard facts" of a potential conflict are required to trigger an obligation to mitigate – the second inquiry. *Id*.

No "hard facts" of any serious or significant conflict of interest are asserted in connection with the decision that was made to add the software procurement to SRA's task order and have SRA integrate the selected products into USAID and DoS existing systems. Later on that continuum, with SRA either acquiring for, or advising the agencies as to software products, any potential conflict would have been in connection with SRA's procurement – a matter over which this court has no jurisdiction. And while plaintiffs contend the selected subcontracts required more integration than the others, plaintiffs do not point to any "hard facts" to support that conclusion, nor do plaintiffs point to evidence that SRA's compensation would and did increase with any additional integration work.

Plaintiffs' claims of conflict or potential conflict in the interrelationship between SRA and the selected subcontractors are simply not in connection with the decision to deviate from a direct procurement upon which jurisdiction is grounded. *Distrib. Solutions*, 539 F.3d at 1345. Even if analysis would extend to SRA's award of subcontracts, while plaintiffs note instances where level of integration was mentioned in evaluations, no hard facts were tendered that the selected subcontractors were going to require more integration than other options and that SRA would receive more compensation as a result.[31] No relevant and viable OCI has been established.

### c. Small Business Requirements

The Small Business Act (SBA) discourages combining procurements and requires, with limited exceptions, consideration of small businesses.

---

[31] Moreover, the Source Selection Plan provides for some analysis and mitigation of OCIs: "7.2 Organizational Conflict of Interest (OCI)[.] The use of Non-disclosure Agreements (NDAs) will be required as necessary by SRA for non-government advisors in order to prevent organizational conflicts of interest." (AR 1110, ECF No. 78-8; AR 1126, ECF No. 78-10.)

(j) Contract bundling.

In complying with the statement of congressional policy expressed in subsection (a) of this section, relating to fostering the participation of small business concerns in the contracting opportunities of the Government, each Federal agency, to the maximum extent practicable, shall—

(1) comply with congressional intent to foster the participation of small business concerns as prime contractors, subcontractors, and suppliers;

(2) structure its contracting requirements to facilitate competition by and among small business concerns, taking all reasonable steps to eliminate obstacles to their participation; and

(3) avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors.

15 U.S.C. § 631(j).

Plaintiffs assert that the agencies' deviation from direct procurement violated laws protective of small businesses in two ways: (1) by combining (bundling) grants management and acquisition assistance software which lessens the likelihood that small businesses (not as likely to have the capability of providing both) could successfully participate;[32] and (2) by failing to consider whether there were two or more small businesses that could provide either, or both of the packages at a reasonable price in contravention of the "Rule of Two" – FAR § 19.502-2(b).

In RFI #1 the use of multiple vendors was possible, which would have allowed STR and DSI to provide services directly to the government as prime contractors. Plaintiffs represent that grants management software products and acquisition assistance solutions software products had previously been procured separately.

---

[32] Paragraph 39 of plaintiffs' Complaint asserts:

By combining the separate, stand-alone software package for grants management with the separate stand-alone software package for acquisition assistance into one purchase by SRA, the Agencies have improperly bundled the procurement in violation of CICA, the Small Business Act, and applicable federal regulations.

There are a number of small businesses that focus on one or the other type of software solutions; however, when two types of software products are bundled they inevitably favor large providers.  Plaintiffs argue that the use of SRA to procure both software packages removed two direct, federal procurement opportunities from competition.  Moreover, regardless of whether there was a bundling violation, it is asserted that the government's failure to engage in a bundling analysis, once it decided to procure two software packages through a single procurement process, violated the Small Business Act.

Defendant counters that plaintiffs fail to cite any statute or precedent that would require SRA, a private entity, to comply with the Small Business Act; and regardless, the bundling prohibition cited lacks merit because the "subject procurement" was not a bundled contract.   Rather,"'bundling of contract requirements'" is defined as "consolidating 2 or more procurement requirements for goods or services previously provided or performed under separate smaller contracts into a solicitation . . . for a single contract that is likely to be unsuitable for award to a small-business concern." 15 U.S.C. § 632(o)(2); FAR § 2.101.  This was a new collaborative endeavor; whether plaintiffs provided the software products and/or integration to another agency, is not the standard.   Neither the determination following RFI #1 that a prime integrator was required, nor the finding that no one vendor could provide both acquisition and assistance software that optimally met the needs of the agencies, are assailed, rendering inapt plaintiffs' citation to the Rule of Two in the Small Business Act.

Again, the precise point on this procurement continuum is not SRA's RFI #2 and the two subcontract awards.   Thus defendant's point that SRA was not constrained by small business concerns, while accurate, lacks relevance.  "Rather, [the protestors] are contesting the government's *decision to task SRA* with awarding subcontracts … instead of procuring the software itself through a direct competitive process." 539 F.3d at 1343-44 (emphasis added).  Nevertheless, mindful that RFI #1 was gathering information as part of a proposed procurement – "'the process for determining a need' for acquisition and assistance solutions for JAAMS," *Distributed Solutions*, 539 F.3d at 1346 (citing 41 U.S.C. § 403(2)), a viable SBA protest on the bases advanced by plaintiffs is not stated.

### d.  SRA's role

Plaintiffs point to evidence in the AR that SRA was merely an advisor; the USAID and DoS made the ultimate product selections despite what the contractual trappings may provide.

> [T]he Government wanted to have its cake and eat it too – use a third party to administer its procurement process, thereby avoiding all federal procurement laws and regulations, such as competitive bidding processes, required contract vehicles, and pre-procurement analysis, including one for organizational conflicts of interest, yet still retain the decision making authority as to what software would be procured on its behalf.  And the Government claimed all of its activities were not subject to any judicial review.

(Pls.' Mem. Supp. Mot. J. AR 2, ECF No. 78.)

The prior disposition of this issue in the court's previous opinion, which was not specifically addressed by the Federal Circuit's reversal,[33] is relevant.

> SRA proceeded to procure the software by means of executing subcontracts with the selected vendors, Infoterra and Compusearch. Plaintiffs' subcontract proposals, submitted to SRA, were not chosen. Plaintiffs argue that the award of subcontracts by SRA to Infoterra and Compusearch raise viable procurement protests, within the ambit of 28 U.S.C. § 1491(b), in that it is asserted that SRA was operating as a purchasing agent for USAID in these transactions so that a Federal agency procurement actually occurred.  USAID and DoS officials did substantially participate in the evaluation of vendors submitting proposals to SRA and the resulting choice of Infoterra and Compusearch for SRA subcontracts, but the terms of the subcontracts belie purchasing agent status for SRA. There is no direct USAID or DoS liability to the

---

[33] The Federal Circuit reversed the dismissal for lack of jurisdiction because the agencies were in the process of determining the type of software to be acquired – their "needs" – a pre-procurement decision over which this court has jurisdiction in the Tucker Act as a "proposed procurement."  The first RFI "solici[ted] information from outside vendors, and then used this information to determine the scope of services required by the government."  539 F.3d at 1346.

vendors. SRA retained the sole responsibility to direct the vendors in their work under their subcontracts and payments to the subcontractors were to be made by SRA.  Pursuant to the test established by *US West Communications Services, Inc. v. United States*, 940 F.2d 622, 629-30 (Fed. Cir. 1991) and *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983), SRA cannot be relegated to purchasing agent status in its subcontracting activity under the PRIME 2.2 task order.  As a result, the subcontracts at issue were not awarded by, or on behalf of, a Federal Agency.

*Distrib. Solutions*, 76 Fed. Cl. at 528.  The previous discussion in this regard, to the extent not reversed by the Federal Circuit, is reaffirmed.

### e.  Implied duty of good faith and fair dealing

Plaintiffs also claim that the government breached the implied duty of good faith and fair dealing, citing *Keco Industries, Inc. v. United States*, 203 Ct. Cl. 566, 492 F.2d 1200, 1203-04 (1974), and contend that the implied duty of good faith and fair dealing survived the passage of Administrative Dispute Resolution Act (ADRA), Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996).  *See Res. Conservation Group, LLC v. United States*, 597 F.3d 1238 (Fed. Cir. 2010); *Castle-Rose, Inc. v. United States*, 99 Fed. Cl. 517, 529-32 (2011); *Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 97 Fed. Cl. 96, 151-52 (2010); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 94 Fed. Cl. 394, 398 (2010); *FAS Support Servs., LLC v. United States*, 93 Fed. Cl. 687, 694-96 (2010).

Assuming the implied covenant remains, the circumstances presented do not constitute a breach thereof.  Plaintiffs admit the agencies did not believe the procurement switch here was subject to federal procurement law.  The Federal Circuit's *Distributed Solutions* opinion delineated the extension of bid protest jurisdiction into pre-procurement decisions.  As plaintiffs characterize in responding to defendant's criticism of their failure to cite authority for their assertions of OCI violations:  "[o]f course there are no cases directly on point; there was no such jurisdiction in this Court or in any other forum prior to this case." (Pls.' Resp./Reply Def.'s Mot. Dismiss/Opp'n Pls.' Mot. J. and Cross-Mot. J. AR 12, ECF No. 88.)  No viable lack of good faith and fair dealing has been established by plaintiffs in this matter.

### D.  Waiver

Defendant contends plaintiffs' claimed errors in the "procuring method" were waived by failing to timely raise them.  (Def.'s Mot. Dismiss 3, ECF No. 79.)  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("*Blue & Gold Fleet*") (holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.")  *Id*.  Because the protestor was aware that the Park Service was not applying the Service Contract Act, the Federal Circuit found that the protestor waived its opportunity to raise that claim in subsequent bid protest litigation.  *Id.*

Imposing a timeliness requirement for objections to patent defects in the terms of a solicitation fosters efficiency.

It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation.  Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.

*Id.* at 1314 (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n.14 (2005)).

Citing *Blue & Gold Fleet*, defendant contends here that the infirmities cited in connection with the decision to deviate from direct procurement to add to SRA's task order was a patent defect – one that was obvious and apparent.  As a result, plaintiffs' failure to object prior to responses to either RFI, or prior to the award of subcontracts, was a waiver of all the objections about the procurement process raised in this litigation.

Plaintiffs counter that these events were in 2005, more than three years before *Blue & Gold Fleet,* and the waiver principles therein should not apply retroactively.  Additionally, waiver and timeliness principles are not jurisdictional; rather, are affirmative defenses and defendant's belated attempt to raise waiver should be

thwarted.  Also, both RFI #1 and RFI #2 differed materially from the RFP in *Blue & Gold Fleet* such that plaintiffs could not be required to voice objections, nor would there have been a forum to submit what would have been a pre-proposed procurement objection.  Plaintiffs also conclude that it is the process, not any solicitation term, that is protested, making this situation distinguishable from the *Blue & Gold Fleet* precedent.  In *Blue & Gold Fleet* the plaintiff had been aware of issues with the terms of the solicitation but failed to raise them prior to the deadline for submission of proposals, waiting until after the proposal deadline to file a bid protest action in this court.  Nothing about the timing of the events leading up to the protest in *Blue & Gold Fleet* was similar to those at bar.[34]

*Blue & Gold Fleet* has been applied to preclude post-bid and post-contract award objections to the terms of direct government solicitations.  *Ne. Military Sales, Inc. v. United States*, 100 Fed. Cl. 103, 117 (2011) (holding that objection that terms of the solicitation were irrational was waived); *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 263 (2011) (finding objection to the terms of solicitation as not in conformance with FAR was waived); *Ceres Envtl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 310 (2011) (applying *Blue & Gold Fleet* to procedure for recompetition); *Hi-Tech Bed Sys., Corp. v. United States*, 97 Fed. Cl. 349, 354 (2011) (concluding objections to terms of solicitation waived by failing to file protest until

---

[34] Application of *Blue & Gold Fleet* has generally been limited to challenges to the terms of a solicitation by a disappointed bidder made initially after the protestor submitted a bid under that solicitation, and did not get an award.  *See Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 737 (2007) (dismissing as untimely under the *Blue & Gold Fleet* waiver rule because "Benchmade knew the solicitation was unrestricted prior to submission of its proposal, and yet, waited until after contract award to [awardee] before filing a protest at the GAO"); *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 533 n.7 (2007) (rejecting protestor's argument to the extent it involved a challenge to the solicitation's terms after receipt of proposals); *Scott v. United States*, 78 Fed. Cl. 151, 154 n. 2 (2007) (finding protestor had no standing to challenge the terms of a solicitation after contract award); *Moore's Cafeteria Servs. v. United States*, 77 Fed. Cl. 180, 184-85 (2007) (holding protestor waived its right to challenge a solicitation amendment by not objecting to its terms during the bidding process).  In contrast in *Esterhill Boat Service Corp. v. United States*, 91 Fed. Cl. 483 (2010), the court dismissed a protestor's claims for lack of subject matter jurisdiction, despite the fact that the protestor had sought administrative relief from the agency and GAO.  The trial court explained that "[t]he appeals court could have allowed contractors to file agency-level protests to preserve their pre-award claims, or to object in a manner other than by filing suit in federal court. Instead, the court ruled that a contractor wishing to object to terms of a solicitation must file suit in the Court of Federal Claims before the bidding process ends, or not at all." *Id.*

after award to another); *Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 538 (2011) (indicating protestor had a duty to inquire or seek clarification about assertedly ambiguous phrase "largely similar"); *Matt Martin Real Estate Mgmt. LLC v. United States*, 96 Fed. Cl. 106, 117-18 (2010); *Pyramid Real Estate Servs., LLC v. United States*, 95 Fed. Cl. 125, 135 (2010) (objection that proposals contain labor mix was waived by not raising it before the award was made); *Weston Solutions, Inc. v. United States*, 95 Fed. Cl. 311, 323 (2010) (objections to terms of agency synopsis seeking to identify top three qualified Architect-Engineer firms for possible contract negotiations were waived by failing to challenge on that basis prior to the evaluation), *aff'd*, 440 F. App'x 926 (Fed. Cir. 2011); *DCS Corp. v. United States*, 96 Fed. Cl. 167, 173 (2010); *Office Depot, Inc. v. United States*, 95 Fed. Cl. 517, 530 (2010); *Navarro Research & Eng'g, Inc. v. United States*, 94 Fed. Cl. 224, 234 (2010) (objections to agency authority to contract must be made prior to award); *Shamrock Foods Co. v. United States*, 92 Fed. Cl. 339, 345-46 (2010).

Moreover, plaintiffs raised questions about the agencies' shift from a direct procurement path by filing agency level protests before SRA awarded software subcontracts. *DGR Assocs., Inc. v. United States*, 94 Fed. Cl. 189 (2010), *appeal docketed*, No. 11-5080 (Fed. Cir. argued Apr. 4, 2012) (rejecting *Blue & Gold Fleet* as requiring commencement of litigation in the Court of Federal Claims prior to close of bidding; rather "a party must have done something prior to the closing date to protest the solicitation error, before raising 'the same objection subsequently . . . in the Court of Federal Claims.'") (alteration in original)). STR questioned the reasoning for RFI #2 as an RFQ from USAID was expected. (AR 143.) Plaintiff STR filed a GAO protest on October 13, 2005 (AR 1-118), prior to SRA's subcontract with Infoterra dated November 9, 2005 (AR 642-79). Plaintiff DSI filed a GAO protest on November 18, 2005 (AR 243-58), prior to SRA's subcontract with Compusearch dated February 1, 2006 (AR 680-735).

Also, there was no solicitation over which this court had jurisdiction. As instructed by the Federal Circuit, the source of this court's jurisdiction is the process of determining a need. RFI #1 was part (and a public part) of the beginning of the process of determining a need for a government procurement, which was abandoned without adequate rationale in favor of an existing contract vehicle. *See Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 179, 182 n.4 (2011) (suggesting that *Blue & Gold Fleet* may extend to challenges to the solicitation process or evaluation of proposals); *but see Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 90-91 (2011).

Lacking an agency solicitation to which they could object, there is no viable basis on which a *Blue & Gold Fleet* type waiver could be based.

Plaintiffs' alternate argument that *Blue & Gold Fleet* can only be applied prospectively is not persuasive. The Federal Circuit did not so limit its holding.

> We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims. This is an issue of first impression for this court.

492 F.3d at 1313. The waiver principles were applied initially to the parties in *Blue & Gold Fleet.* The Federal Circuit did not defer application of the principle to future bid protests. The waiver principles of *Blue & Gold Fleet* simply do not apply to the decision to deviate from a direct procurement.

### E.  Motion to Strike/or to Supplement Administrative Record

Plaintiffs' Motion to Supplement the Administrative Record (ECF No. 15) sought to augment the AR with four documents: (1) a July 12, 2006 email from plaintiffs' counsel to defendant's former counsel of record (ECF No. 15-2); (2) a declaration of Dean Moore, an STR sales representative, with attachments (ECF No. 15-3); (3) a supplemental declaration of an STR employee, Robert J. Fries (ECF No. 15-4); and (4) a May 23, 2006 print-out from Compusearch's website (ECF No. 15-5). Defendant filed an opposition on August 18, 2006. (ECF No. 16.) In this court's May 21, 2007 opinion, plaintiffs' Motion to Supplement was denied. 76 Fed. Cl. at 528. In reversing and remanding on jurisdictional grounds, the Federal Circuit directed that plaintiffs be allowed to renew that Motion. 539 F.3d at 1346 n.3.

Plaintiffs did not renew their Motion; instead attached the same four documents to their December 21, 2010 Response to the defendant's Motion for Judgment on the Administrative Record (ECF No. 88) together with a fifth, a journal article, Michael Mickaliger, *The Anatomy of a Multi-Agency Foreign Affairs IT Acquisition*, Contract Management, November 2006. (ECF No. 88-1.)

Defendant's Motion to Strike (ECF No. 94) addresses these five documents claimed by plaintiffs to be supplements to the AR (numbered AR 1163-76). Defendant contends they are not part of the previously-filed AR and should be stricken, because the court's review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). These documents include hearsay statements of purported fact and opinion that were not before the agencies, and describe events after SRA's subcontract awards. Even if they had been part of that record, plaintiffs failed to make an appropriate supplementation motion. Accordingly, defendant asks that the five exhibits attached to Plaintiffs' Response/Reply to Defendant's Motion to Dismiss/Opposition to Plaintiffs' Motion for Judgment and Cross-Motion for Judgment upon the Administrative Record (ECF No. 88-1 through 88-5) be stricken.

Plaintiffs respond that in this pre-procurement setting, the AR is a "fiction," and that documentation of the agencies' decision-making is for the most part non-existent. Also, ramifications, most particularly conflicts of interest resulting from the failure to consider the possibility, manifested after, or as a result of the ultimate procurements, would not have been in the AR and are necessary evidence of the conflicts or potential conflicts alleged. Plaintiffs also represent that prior counsel for defendant agreed to this supplementation.

According to the standard articulated in *Axiom,* "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review'" and the court must decide "whether supplementation of the record [is] necessary in order not 'to frustrate effective judicial review.'" 564 F.3d at 1380-81 (citations omitted); *see also Impresa Construzioni*, 238 F.3d at 1338 (supplementing justified when "required for meaningful judicial review"); *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005) ("[E]xceptions to the general rule against extra-record evidence are based upon necessity, rather than convenience, and should be triggered only where the omission of extra-record evidence precludes effective judicial review.").

In response to defendant's Motion to Strike, plaintiffs removed two of the contested documents from its supplementation request, asserting reliance thereon for argumentative purposes is not dependant upon their inclusion in the AR. They are the Mickaliger article (Ex. A to Pls.' Resp./Reply to Def.'s Mot. to Dismiss/Opp'n

Pls.' Mot. J. and Cross-Mot. J. A.R., ECF No. 88-1) and the July 12, 2006 email between counsel concerning supplementation (ECF No. 88-2).  The remaining three documents are: (1) the declaration of Dean Moore (ECF No. 88-3); (2) the supplemental declaration of an STR employee, Robert J. Fries (ECF No. 88-4); and (3) a May 23, 2006 screen-shot from Compusearch's website (ECF No. 88-5).

Mr. Moore's Declaration (marked AR 1165-73, ECF No. 88-3), dated August 1, 2006, describes a similar software product market analysis approximately a year prior to RFI #1, conducted by Booz Allen Hamilton ("BAH") on behalf of the USAID and DoS,[35/] and outlines STR's product demonstrations and favorable feedback from the agencies.  In that Declaration Mr. Moore summarizes a conversation he had with BAH after the selection of Infoterra for the SRA subcontract.  According to the Declaration, Greg Dunn, then a BAH representative (who was working under SRA's Prime contract) recalled the prior demonstration and evaluations, and confirmed that STR's product was the "clear leader" and that "Infoterra didn't have much to show," but that SRA was going to make its own decisions regardless of BAH's input.

Mr. Fries' Supplemental Declaration (marked AR 1174, ECF No. 88-4) describes his October 6, 2005 telephone conversation with Kakali Banerjee, an SRA Vice-President regarding the provision in RFI #1 that "'USAID and [DoS] require proven COTS products that are based on a mature, fully developed system that is already in production in other Federal agencies.'"  According to the Declaration, Ms. Banerjee was satisfied with the Department of Commerce's reference for Infoterra, which had a "solution" in that agency, even though it was not Infoterra's whole application nor was it in production.

The Compusearch corporate information (marked AR 1175-76, ECF No. 88-5, a two-page web page screen shot from May 23, 2006), identifies members of the board of directors, including Edward E. Legasey, a former Executive Vice President and Chief Operating Officer of SRA.

---

[35/] Attached to his Declaration are: (1) a May 26, 2004 email sent on behalf of USAID and DoS asking for participation in a market analysis to inform the agencies about vendor grants management products.  Included in the email were a requirements matrix, a vendor survey and instructions – all to be sent to Mr. Dunn at BAH; (2) a June 4, 2004 email from Mr. Daniel J. Walt to Mr. Moore with instructions for a product capability demonstration; (3) a March 21, 2005 email from Mr. Walt to Mr. Moore requesting a GSA price quote; and (4) a June 22, 2005 email from Mr. Young of DoS to Mr. Moore instructing him to be on the watch for an RFI from USAID.

These three documents are all offered relative to contentions concerning SRA's award of the subcontracts which are not an issue in this case.

> THE COURT: I take it that you're not really contesting the awards of the subcontracts?
> Mr. COULTER: No, Your Honor.

(Tr. Oral Arg., June 8, 2011, at 9, ECF No. 108.)  Accordingly, the three remaining documents are neither necessary nor appropriate for inclusion in the AR. Alternatively, even if the three documents were considered, the court's conclusions herein would not change.

## CONCLUSION

After commencing a proposed procurement and without rationale, USAID and DoS chose to forego direct procurement of acquisition assistance and grants management software products, and in connection therewith, failed to consider competition.  Plaintiffs suffered non-trivial competitive injuries as a result.

Accordingly, it is **ORDERED**:

(1)  Defendant's Motion to Strike the Exhibits to Plaintiff[s'] December 21, 2010 Response (ECF No. 94), is **GRANTED** as to the three documents identified above, and **DENIED as moot** as to the two documents plaintiffs withdrew;

(2)  Plaintiff[s'] Motion for Judgment on the Administrative Record (ECF No. 77) is **GRANTED**;

(3)  Defendant's Motion to Dismiss and Cross-Motion for Judgment Upon the Administrative Record (ECF No. 79) is **DENIED**; and

(4)  Consistent with the Federal Circuit's remand, Plaintiffs' request for an opportunity to file an application for proposal preparation costs (Pls.' Mot. J. AR 14, ECF No. 77) is **GRANTED**.

The parties are encouraged to reach agreement on the proposed preparation amounts to be awarded and cooperate in an informal exchange of itemized and

supportive evidence (invoices, statements and the like) of all such costs asserted, with the goal of consensus on the amount of recoverable costs, or at the minimum, agreement that costs asserted are adequately supported from a books and records perspective.

Absent agreement and the filing of a Joint Status Report, plaintiffs may file an application on or before **May 14, 2012**.  Defendant shall file any response within **thirty (30) days** of any such filing.

**IT IS SO ORDERED**.

s/ James F. Merow
James F. Merow
Senior Judge

# **APPENDIX A**

## Attachment 1 – Source Selection Organizations

### JAMS Source Selection Organization



### PSIP Source Selection Organization



**Protected Information To Be Disclosed Only**
**In Accordance With United States**
**Court of Federal Claims Protective Order**

**AR 001127**

**Attachment 2 - SSA  Membership**

| NAME | POSITION / TITLE | AGENCY / ORGANIZATION |
|------|------------------|----------------------|
| Frank Coulter | Acting Assistant Secretary, Administration | DoS |
| Steven Wisecarver | Acting Assistant Administrator, Management | USAID/M |

Protected Information To Be Disclosed Only
In Accordance With United States
Court of Federal Claims Protective Order

AR 001128

**Attachment 3 - SSAC Membership**

| NAME | POSITION / TITLE | AGENCY / ORGANIZATION |
|---|---|---|
| Michael Walsh | Sr Procurement Exec. | USAID/M/OAA |
| Corey Rindner | Sr Procurement Exec. | DoS/A/OPE |

Source Selection Sensitive – See FAR 3.104                                    10

**Protected Information To Be Disclosed Only
In Accordance With United States
Court of Federal Claims Protective Order**

## Attachment 4 – JAMS SSET Membership

### *Source Selection Evaluation Team*

| NAME | POSITION / TITLE | AGENCY / ORGANIZATION |
|------|------------------|------------------------|
| Mercedes Eugenia | Co-Chairperson and Grants SME | USAID |
| Phyllis Swann | Co-Chairperson and Grants SME | DOS |
| Member | Grants SME | USAID |
| Member | CTO | USAID |
| Member | CTO | USAID |
| Member | FM | USAID |
| Member | IRM | USAID |
| Julie Johnson | Grants SME | DOS |
| Anita Exum | Grants SME | DOS |
| Pearl Paugh | CTO | DOS |
| William French | RM | DOS |
| Member | ILMS | DOS |

### *Senior Advisors

| NAME | AGENCY / ORGANIZATION |
|------|------------------------|
| **David Ostermeyer | USAID |
| **John Streufert | USAID |
| **Advisor | DOS |
| **Advisor | DOS |

### *Advisors

| TYPE | AGENCY / ORGANIZATION |
|------|------------------------|
| **Non-Government Advisor | SRA |
| **Non-Government Advisor | Accenture |
| **Non-Government Advisor | Booz Allen Hamilton |
| **Non-Government Advisor | LMI |
| **Advisor | FM (Financial Management) |
| **Advisor | IRM (Enterprise Architecture/Technology) |
| **Advisor | JA (Legal) |
| **Advisor | User |
| **Advisor | Logistics |
| **Advisor | Small Business |
| **Advisor | Source Selection Expert Advisor |
| **Advisor | HQ AFMC/XRQ or Center AE |

*The list illustrates the type of expertise that may be needed during the evaluation process.  Advisors will be engaged on an "as needed" basis.
**These individuals serve as key advisors to the SSA and SSET and do not evaluate or rate proposals.

Source Selection Sensitive – See FAR 3.104                                          11

**Protected Information To Be Disclosed Only
In Accordance With United States
Court of Federal Claims Protective Order**

AR 001130

## Attachment 5 – PSIP SSET Membership

### *Source Selection Evaluation Team*

| NAME | POSITION / TITLE | AGENCY / ORGANIZATION |
|---|---|---|
| Mercedes Eugenia | Chairperson and CO SME | USAID |
| Member | CO SME | USAID |
| Member | EXO SME | USAID |
| Member | EXO SME | USAID |
| Member | CTO SME | USAID |
| Member | CTO SME | USAID |
| Member | IRM – Technical SME | USAID |
| Member | IRM – User | USAID |
| Member | FM SME | USAID |

### *Senior Advisors*

| NAME | AGENCY / ORGANIZATION |
|---|---|
| **David Ostermeyer | USAID/FM |
| **John Streufert | USAID/M/IRM |
| **Frank Coulter | DOS |
| **Corey Rindner | DOS |

### *Advisors*

| TYPE | AGENCY / ORGANIZATION |
|---|---|
| **Non-Government Advisor | SRA |
| **Non-Government Advisor | Booz Allen Hamilton |
| **Advisor | FM (Financial Management) |
| **Advisor | IRM (Enterprise Architecture/Technology) |
| **Advisor | JA (Legal) |
| **Advisor | User |
| **Advisor | Logistics |
| **Advisor | Small Business |
| **Advisor | Source Selection Expert Advisor |
| **Advisor | HQ AFMC/XRQ or Center AE |

*The list illustrates the type of expertise that may be needed during the evaluation process.  Advisors will be engaged on an "as needed" basis.
**These individuals serve as key advisors to the SSA and SSET and do not evaluate or rate proposals.

**Protected Information To Be Disclosed Only**
**In Accordance With United States**
**Court of Federal Claims Protective Order**

AR 001131